**Laureen M. DAVIS and Zachary A. Davis, her minor son, Plaintiffs,**

v.

**THE UNITED STATES, Defendant.**

No. 99–471C.

United States Court of Federal Claims.

Aug. 10, 2001.

**194**

Rita Heimes Logan, Portland, ME, for plaintiffs.

Kyle E. Chadwick, with whom were David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, James M. Kinsella, Assistant Director, United States Department of Justice, Washington, DC for defendant. Gregory C. Brady and Lila S. Sultan, Office of Justice Programs, United States Department of Justice, Washington, DC, of counsel.

## OPINION AND ORDER

HEWITT, Judge.

This matter is before the court on the parties' cross-motions for summary judgment, pursuant to Rule 56 of the Court of Federal Claims (RCFC), and Defendant's Motion for Partial Relief from Remand Order. Plaintiffs, Laureen M. Davis and her son Zachary A. Davis, seek compensation under the Public Safety Officers' Benefits Act (PSOBA), 42 U.S.C. § 3796 (1994), for the death of their late husband and father, Officer Kenneth L. Davis of the Seattle Police Department. The PSOBA provides payment of a $100,000 death benefit to the surviving spouse and children of a public safety officer who "die[s] as the direct and proximate result of a personal injury sustained in the line of duty." 42 U.S.C. § 3796(a) (1994).

Plaintiffs assert in their Motion for Summary Judgment (Pl.'s Mot.) that the Bureau of Justice Assistance (BJA) failed to comply substantially with the PSOBA and its implementing regulations when it denied plaintiff's claim for benefits. Pl.'s Mot. at 2–3. Plain-

tiffs also allege that the BJA's findings lacked substantial evidentiary support. *Id.*

In its Response to Motion for Summary Judgment and Defendant's Cross–Motion for Summary Judgment (Def.'s Mot.), defendant asserts that the BJA's decision was both lawful and supported by substantial evidence. Def.'s Mot. at 9.

In an Opinion and Order of March 31, 2000, as amended by order of May 1, 2000,[1] the court remanded to the Director of the BJA to evaluate plaintiff's claim consistent with the court's analysis of the PSOBA. *Davis v. United States*, 46 Fed.Cl. 421 (2000). The court suspended judgment on the parties' cross-motions pending the Director's decision. *Id.* at 428.

The BJA Director denied plaintiffs' claim on remand on June 22, 2000. The court now considers the parties' cross-motions for summary judgment in light of the Director's decision. The court also considers Defendant's Motion for Partial Relief from Remand Order (Def.'s Mot. Relief) which seeks recognition that *Budd v. United States*, 225 Ct.Cl. 725 (1980), cited in the court's March 31, 2000 opinion as non-precedential, is controlling precedent. Def.'s Mot. Relief at 1–2.

For the following reasons plaintiffs' motion for summary judgment is GRANTED. Defendant's cross-motion for summary judgment is DENIED. Defendant's motion for partial relief from the remand order is GRANTED IN PART and DENIED IN PART.

## I. Background

On May 11, 1995, Seattle Police Officer Kenneth L. Davis was working a shift that was to officially end at 1:30 a.m.[2] To offset a half hour of uncompensated overtime, however, Officer Davis was ordered to leave work at 1:00 a.m. Still in uniform, Officer Davis left the police station in his personal vehicle shortly after 1:00 a.m.

---

1. At defendant's request, the court amended its opinion to remand this matter to the Director of the BJA rather than the BJA Hearing Officer.

2. The facts are drawn from Def.'s Mot. and the Excerpt of Record plaintiffs submitted before the Ninth Circuit Court of Appeals (ER). These facts are also set forth at 46 Fed.Cl. at 422–23, but are repeated here for convenience.

At approximately the same time, a Washington state trooper observed Robert Duane Knowles driving erratically on nearby Interstate 5. The trooper pulled Knowles over onto an off ramp but, as the trooper exited his vehicle and approached Knowles car, the car sped away. The trooper pursued Knowles for a short distance, then desisted because of the danger of continuing a high speed chase through the city streets.

Knowles continued to flee for several blocks. As he approached the intersection of 107th and Meridian Avenue at an estimated speed of 66 miles per hour, Officer Davis, on his way home from work, entered the same intersection at approximately 31 miles per hour. Knowles ran through a stop sign and into the intersection where he collided with Officer Davis. The impact spun Officer Davis's car and threw him from the vehicle onto the street where he died instantly. Knowles fled the scene on foot, but was apprehended a short time later by a police K–9 unit. Knowles later tested positive for cocaine.

On December 14, 1995, a Washington State Superior Court jury found Knowles guilty of Second Degree Murder, Vehicular Homicide, Hit and Run, and Violation of the Uniform Controlled Substances Act–Possession of Cocaine.

Following Officer Davis's death, his widow applied for death benefits under the PSOBA on behalf of herself and her son. The PSOBA provides for payment of a $100,000 death benefit to the surviving spouse and children of a public safety officer who has "died as a direct and proximate result of a personal injury sustained in the line of duty." 42 U.S.C. § 3796(a). The BJA denied the claim, reasoning that plaintiffs were ineligible for benefits because Officer Davis's death occurred in an accident while commuting from work, not while "in the line of duty." ER at 514–15. Plaintiffs requested agency review, but the Hearing Officer affirmed the BJA's denial of benefits.[3] *Id.* at 520.

Plaintiffs initially sought review of the Hearing Officer's decision in the United States Court of Appeals for the Ninth Circuit. That court determined that it did not have jurisdiction to review PSOBA decisions and transferred the case to the United States Court of Federal Claims. *Davis v. United States,* 169 F.3d 1196, 1200 (9th Cir.1999); *see also Wydra v. Law Enforcement Assistance Admin.,* 722 F.2d 834, 839–40 (D.C.Cir. 1983) (holding that the Claims Court, not the Court of Appeals, has jurisdiction to review PSOBA cases). Upon transfer, the parties cross-moved for summary judgment. This court determined that the Hearing Officer made two legal errors in reviewing the case. First, the Hearing Officer relied on a non-precedential footnote in *Budd v. United States,* 650 F.2d 290, n. 6 (Ct.Cl.1980), that involved a definition of "line of duty action" that does not comport with either the text of the PSOBA or its legislative history. *Davis,* 46 Fed.Cl. at 424. Second, the Hearing Officer failed to consider reasonable doubt in evaluating evidence regarding Officer Davis's awareness of the circumstances of his death. *Id.* Accordingly the court remanded to the BJA to evaluate plaintiffs' benefits claim consistent with the court's analysis of the PSOBA and the Hearing Officer's errors. The court suspended judgment on the parties' cross-motions for summary judgment pending the BJA's decision on remand.

The BJA Director rendered her decision on June 22, 2000, denying plaintiffs' claim for benefits. Def.'s Mot. Relief, BJA Director Determination (Remand Decision). She concluded that Officer Davis was not on duty at the time of his death and therefore was not killed in the line of duty. *Id.* at 3–5. The Director also determined that because Officer Davis was not on duty at the time of his death, the reasonable doubt rule of 28 C.F.R. § 32.4 does not apply. *Id.* at 5–6.

Upon filing the BJA Director's decision, defendant moved for partial relief from the remand order. Def.'s Mot. Relief. Specifically, defendant asserts that *Budd* is in fact a published opinion and asks the court to rec-

---

**3.** A claimant for PSOBA benefits may request agency review by a hearing officer within 30 days after notification of ineligibility. 28 C.F.R. § 32.24(a) (2000). The BJA Director may then,

on his or her own motion, review the hearing officer's decision. *Id.* § 32.24(h)(1). A decision by the BJA Director will be the final decision of the agency. *Id.* § 32.24(h)(2).

ognize its holding as controlling precedent. *Id.* at 1–2. The court now considers Defendant's Motion for Partial Relief from Remand Order and the parties' cross-motions for summary judgment.

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1131 (Fed.Cir.1998) (quoting RCFC 56(c)). A fact is material when it might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Whether a fact might affect the outcome depends on the substantive law that applies to the case. *H.B. Zachry Co. v. United States,* 28 Fed.Cl. 77, 80 (1993), *aff'd,* 17 F.3d 1443 (Fed.Cir.1994). The court must resolve any doubts about factual issues in favor of the opposing party. *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985).

In reviewing an administrative decision, the court is generally limited to determining: "(1) whether there has been substantial compliance with statutory and implementing regulations; (2) whether there has been any arbitrary or capricious action on the part of the government officials involved; and (3) whether there was substantial evidence supporting the decision." *Morrow v. United States,* 227 Ct.Cl. 290, 647 F.2d 1099, 1102 (1981), *cert. denied,* 454 U.S. 940, 102 S.Ct. 475, 70 L.Ed.2d 247 (1981); *see also Greeley v. United States,* 50 F.3d 1009, 1010 (Fed.Cir. 1995) (quoting *Morrow* ); *Chacon v. United States,* 48 F.3d 508, 511 (Fed.Cir.1995) (same). Plaintiffs raise issues within the first of these three categories, whether the BJA substantially complied with the statutory and implementing regulations of the PSOBA in denying plaintiffs' claim. Brief

of Petitioners Davis (Pls.' Brief).[4] Specifically, plaintiffs assert that the BJA failed to comply with the PSOBA statute, 42 U.S.C. § 3796(a), and regulations when interpreting the term "in the line of duty," when failing to give substantial weight to the findings of state and local agencies, and when applying the reasonable doubt rule, 28 C.F.R. § 32.4 (2000). Pls.' Brief at 16–17, 21.

### B. "In the Line of Duty"

Plaintiffs' death benefits claim hinges on whether Officer Davis was killed "in the line of duty." The PSOBA provides death benefits to survivors of "a public safety officer [who] has died as the direct and proximate result of a personal injury sustained in the line of duty." 42 U.S.C. § 3796(a). The PSOBA implementing regulations define "line of duty" as "[a]ny action which an officer . . . is obligated or authorized by rule, regulations, conditions of employment or service, or law to perform, including those social, ceremonial, or athletic functions to which the officer is assigned, or for which the officer is compensated." 28 C.F.R. § 32.2(c)(1) (2000).

The BJA Hearing Officer concluded that Officer Davis did not die in the line of duty because he "was not driving his employer's vehicle and was not responding to a specific emergency or call for assistance" at the time of the accident. ER at 514. The BJA Director reiterated this conclusion on remand. Remand Decision at 3–5. This court determined that the legislative history of the PSOBA suggests a more expansive definition of the term "line of duty," closer to "on duty" than to the "engaged in a 'specific line of duty action'" definition applied by the BJA. *Davis,* 46 Fed.Cl. at 426. Accordingly, the court remanded to the BJA for a determination commensurate with the legislative history of "line of duty." *Id.* at 428. On remand, the BJA Director determined that Officer Davis was not "on duty" at the time of his death because the "activity of driving home can not be considered in 'discharge of those duties which are required of him in his capac-

---

**4.** In their summary judgment motion, plaintiffs incorporated by reference their legal briefs, as well as the administrative record, filed with the

Ninth Circuit. Plaintiff's Motion for Summary Judgment at 1–2.

ity as a law enforcement officer.'" Remand Decision at 4 (quoting H.R. Conf. Rep. No. 94–1501, at 6 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2510, 2511 (Final Conference Report)). The Director went on to apply the "going and coming" rule, derived from state workers' compensation laws, which the BJA adopted in 1981. *Id.* at 4. This rule, as articulated by the BJA, denies benefits for injuries sustained while coming or going from work unless there is a nexus between the injury and employment demonstrated by 1) being required to drive an employer's vehicle to work; 2) being required to drive one's own vehicle to work; or 3) acting in response to a specific call or emergency. *Id.* The BJA Director concluded that none of these circumstances was present to create a nexus between Officer Davis's injury and his employment as a police officer and therefore Officer Davis was not on duty at the time of his death. *Id.* at 4–5.

In determining whether the BJA Director's interpretation of "line of duty" substantially complies with the PSOBA, the court must first determine whether Congress has spoken directly on the issue. If Congress has spoken, then the court, as well as the agency, must give effect to Congress's express, unambiguous intent. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Chacon v. United States,* 48 F.3d at 511–12 (applying *Chevron* analysis to a PSOBA review). If Congress has not spoken, its silence or ambiguity may constitute an implicit delegation to the agency to interpret the issue. The court must then examine whether the agency's interpretation is based on "a permissible construction of the statute." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778. When examining an agency's statutory interpretation, a court should consider "the principle of deference" and accord "considerable weight . . . to an executive department's construction of a statutory scheme it is entrusted to administer." *Id.* at 844, 104 S.Ct. 2778.

### 1. Chevron Step One: Whether Congress Has Spoken

#### a. Determining Congressional Intent

According to the BJA Director, "[t]he issue as to whether an officer driving to and from work, and specifically when on compensatory time, is 'on-duty' has not been addressed explicitly by Congress in the PSOB statute or in its legislative history." Remand Decision at 4. The fact that Congress has not addressed the specific circumstances at issue in plaintiffs' case, however, does not mean that Congress has not spoken on the issue. *See FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 159, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (recognizing that in some cases, "there may be reason to hesitate before concluding that Congress has intended such an implicit delegation" by its silence). To determine whether Congress has spoken, a court should ask whether the legal question at issue is an important one that Congress is likely to have considered. "'Congress is more likely to have focused upon, and answered, major questions, while leaving interstitial matters to answer themselves in the course of the statute's daily administration.'" *Id.* (quoting Breyer, *Judicial Review of Questions of Law and Policy,* 38 Admin. L.Rev. 363, 370 (1986)). Congress discussed many line of duty circumstances when passing the PSOBA but, as the BJA Director points out, Congress did not address the specific scenario of this case—a public safety officer killed while driving home on compensatory time as his vehicle stops a fleeing felon. These exact circumstances, however, are not the sort of major question Congress is likely to have considered. Thus, Congress's silence on this precise issue does not suggest that it implicitly delegated authority to the BJA to interpret the PSOBA as it relates to such a case. The definition and scope of "line of duty," on the other hand, is the sort of question Congress would have considered. The question here is not whether Congress addressed the specific details of Officer Davis's death, but whether Congress has spoken to define "line of duty" and whether that definition encompasses the circumstances in this case.

Congress limited PSOBA benefits to public safety officers killed "in the line of duty," but did not define "line of duty" within the statute. *See* 42 U.S.C. § 3796(a). When

the plain language of the statute is not instructive, a court should look to the legislative history for guidance on whether Congress has spoken on an issue. 2A Norman J. Singer, *Sutherland Statutory Construction* § 48.04 (5th ed.1992) (citing *United States v. Universal C.I.T. Corp.*, 344 U.S. 218, 222, 73 S.Ct. 227, 97 L.Ed. 260 (1952)).

The House Bill that would become the PSOBA, H.R. 366, sought to provide benefits to the survivors of public safety officers who die from "a personal injury sustained in the performance of duty." H.R.Rep. No. 94–1032, at 12 (1976). Although the House Report used the term "line of duty" when describing the purpose of H.R. 366, *Id.* at 1, the term did not yet appear in the text of the bill. When the Senate Judiciary Committee received the bill after passage in the House, the Committee was also considering a similar Senate Bill, S. 2572, which included the term "line of duty." S.Rep. No. 94–816, at 3 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2504, 2504–05. The Senate Committee amended H.R. 366 by substituting the language of S. 2572, including replacing "performance of duty" with "line of duty." *Id.* at 9. The House Conference Report later replaced this substituted language with a new text that was signed into law as the PSOBA. H.R. Conf. Rep. No. 94–1501, at 5 (1976), *reprinted in* 1976 U.S.C.C.A.N. at 2510–11. This final version of the bill contained the term "line of duty" that had first appeared in the Senate bill. *Id.* at 1.

Defendant cites Senate Report 94–816 as the source of Congressional intent for the meaning of "line of duty." Brief for the Respondents at 20–21. This Senate Report, however, accompanies a superseded version of the bill. The most persuasive source of Congressional intent is rather the Final Conference Report, which contains the final terms agreed to by both the House and Senate. *See* 2A Singer, *Sutherland Statutory Construction* at § 48.08. The Final Con-

ference. Report points out that the House bill authorized benefits only for deaths sustained in the course of certain hazardous duties, whereas the Senate amendment authorized benefits for all line of duty deaths suffered at the hands of a criminal act. H.R. Conf. Rep. No. 94–1501, at 5, *reprinted in* 1976 U.S.C.C.A.N. at 2510–11.[5] The text of the bill accompanying the Final Conference Report not only encompasses the Senate amendment's broader application to "line of duty" deaths, but also includes "line of duty" deaths not resulting from criminal acts. *Id.* at 6.

The Final Conference Report also reflects Senate floor discussion of the amendment adding "line of duty" subsequent to the issuance of Senate Report 94–816, which suggests that "line of duty" is closely akin to "on duty." In the floor discussion, Senator Thurmond, sponsor of the amendment, recognized that "line of duty" would cover a far broader range of incidents by acknowledging that "[a]s the bill came from the committee, a man would have to be killed as a result of a criminal act or an apparent criminal act for recovery to be had. As it is now amended, recovery could be had or the award could be granted if a person were injured in the line of duty." 122 Cong. Rec. 22,645 (1976). Senator Moss, another sponsor of the amendment, felt that broadening the bill to include all "line of duty" deaths would clear up uncertainties and enable the bill to cover circumstances such as "the case of a public safety officer who got into an automobile which had been wired with an explosive that was intended for him, but he would not be engaged at that time in detecting or apprehending criminals or suppressing a criminal act." 122 Cong. Rec. 22,644. Senator McClellan, an original sponsor of the bill, observed that "line of duty" would broaden the scope of the bill to cover situations:

---

**5.** The House Bill, H.R. 366, would have limited benefits to officers injured while apprehending or guarding a suspected criminal or material witness in a criminal proceeding, preventing crime, or performing a duty that is potentially dangerous. H.R.Rep. No. 94–1032, at 13. The Senate amendment would have limited benefits to deaths "in the line of duty from injuries direct-

ly and proximately caused by a criminal act or apparent criminal act." S.Rep. No. 94–816, at 3, reprinted at 1976 U.S.C.C.A.N. at 2504. The bill as enacted, appearing in the Final Conference Report, provided benefits to "a public safety officer [who] has died as the direct and proximate result of a personal injury sustained in the line of duty." H.R. Conf. Rep. No. 94–1501, at 1.

[w]hen an officer is in a police station and decides to walk across the street for lunch ... [and] becomes the target of an assault or is run over by a car.... [or] he is sitting at his desk making out a report or performing office duties, and someone who has been offended by him walks in and shoots him.

122 Cong. Rec. 22,645. Senator Thurmond's comments and the scenarios Senators Moss and McClellan put forward demonstrate an understanding of "line of duty" that encompasses all on duty or job related activities, not merely hazardous or crime-related duties. The Final Conference Report reflects this broader understanding of "line of duty."

■■■ The Final Conference Report defines the scope of "line of duty" by observing that " 'line of duty' is a well established concept and that it is appropriate to extend coverage to all acts performed by the public safety officer in the discharge of those duties which are required of him in his capacity as a law enforcement officer." H.R. Conf. Rep. No. 94–1501, at 6, reprinted at 1976 U.S.C.C.A.N at 2511. It is " 'well established' " that " '[w]here Congress uses terms that have accumulated settled meaning under ... the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.' " *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 322, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) (quoting *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 739–40, 109 S.Ct.

2166, 104 L.Ed.2d 811 (1989)). The Federal Circuit has also determined that the use of identical language in different statutes indicates Congress's intent to imbue the text of those statutes with the same meaning. *See, e.g., Am. Fed. of Gov't Employees v. United States,* 2001 WL 826617, at *7 (Fed.Cir. July 23, 2001) (determining that Congress's use of the same standing language in the Tucker Act and CICA suggests that Congress intended a similar standing requirements to apply to both). The managers on the part of the House and Senate did not specify in what context "line of duty" is a "well established concept." They did, however, emphasize the nature of the activity rather than the manner in which the act is performed—an approach consistent with the use of "line of duty" in military pension and workers' compensation laws.[6] *Harold v. United States,* 225 Ct.Cl. 168, 634 F.2d 547, 552 (1980); *see also Yanco v. United States,* 2001 WL 826939, at *5 (Fed.Cir. July 24, 2001) (examining the use of "personal injury" in workers' compensation law and whether the term is well established enough to apply to the PSOBA); *Demutiis v. United States,* 48 Fed.Cl. 81, 92–93 (2000) (comparing "line of duty" within the PSOBA to workers' compensation law and reiterating the precedential value of *Harold* ), *appeal docketed,* No. 01–5041 (Fed.Cir. Jan. 4, 2001). A search of the United States Code also reveals that Congress has employed "line of duty" in a number of other statutes, leading to the development of a "well established concept." [7] In the context of veterans' benefits, Congress specifically equated "in the line of duty" with "service-connected," suggesting

**6.** Defendant argues that workers' compensation is irrelevant to this case because the standard for awarding benefits is broader than under the PSOBA and because state court workers' compensation rulings constitute legal conclusions not binding on the BJA. Def.'s Mot. at 16. By referring to "line of duty" as a "well established concept," however, Congress expressly invoked the use of the term in other areas of law, the most analogous of which is workers' compensation. *See Russell v. Law Enforcement Assistance Admin.,* 637 F.2d 1255, 1265 (9th Cir.1980) ("[T]he workers' compensation standard is the more apt guide .... [because] it appears that Congress was actually alluding to workers' compensation law when it adopted the 'line of duty' standard .... [and] the purposes of workers' compensation laws and the Benefits Act have common elements."); *see also Yanco v. United*

*States,* 2001 WL 826939, at *5 (Fed.Cir. July 24, 2001) (examining the use of "personal injury" in state workers' compensation law as it relates to the PSOBA); *Demutiis v. United States,* 48 Fed. Cl. 81, 92, n. 15 (examining the Congressional hearings preceding the PSOBA and their references to workers' compensation laws). Moreover, the BJA itself borrows from workers' compensation law when it applies the going and coming rule which is derived from state workers' compensation laws. ER at 514; Remand Decision at 4–5. While not binding authority, workers' compensation law is far from irrelevant in the context of PSOBA cases.

**7.** Each of the statutes discussed in the balance of the paragraph was enacted before the PSOBA.

that the determining factor is a nexus between the injury giving rise to benefits and a person's duties as a member of the armed forces. 38 U.S.C. § 101(16) (1994); 38 U.S.C. § 1735(2) (1994); *see also* 38 C.F.R. § 3.1(k) (2000). Congress also provides death benefits for federal employees injured "in the performance of duty," which emphasizes the nature of the duty as well. 5 U.S.C. § 8133 (1994). For tort claims, Congress has defined "line of duty" as " '[a]cting within the scope of his office or employment,' in the case of a member of the military or naval forces of the Unites States or a member of the National Guard." 28 U.S.C. § 2671 (1994). For the Coast Guard Reserve and Auxiliary, "line of duty" means "performing any duty to which he has been assigned ... includ[ing] time engaged in traveling back and forth between the place of assigned duty and the permanent residence of a member of the Auxiliary." 14 U.S.C. § 832 (1994). And for agency heads, acting in the "line of duty" includes rendering emergency fire extinguishing and life preserving assistance within the vicinity of the agency facilities. 42 U.S.C. §§ 1856b, 1856c (1994). In each of these contexts, Congress has used the term "line of duty" while emphasizing the nature of the duty, not its timing or the manner in which it was performed.

■ As both the legislative history of the PSOBA and Congress's use of the term "line of duty" in analogous federal legislative contexts indicate, Congress has spoken on the issue of "line of duty" and its scope. A public safety officer is killed in the "line of duty" when his or her death results from the performance of any duty required by law or terms of employment or as a consequence of his or her identity as a safety officer. "Line of duty" is thus similar to "on duty"—not "on duty" merely in the sense of being on the clock, but also "on duty" in the sense of actively performing the duties of a public safety officer. This includes not only hazardous or crime-related duties, but all duties of employment. Since Congress, through the guidance of the Final Conference Report and comments by the bill's sponsors, has spoken to define "line of duty," both the BJA and the court must give effect to the scope of that

definition when assessing PSOBA claims. *See Chevron,* 467 U.S. at 842, 104 S.Ct. 2778.

b. Giving Effect to Congressional Intent

■ The legislative history of the PSOBA demonstrates that Congress intended the act to cover all work-related deaths suffered while on duty, regardless whether the activity leading to the officer's death involves a criminal or inherently dangerous act. Similarly, the BJA, as a practice, presumes that officers killed "on duty" are killed " 'within the line of duty.' " Remand Decision at 3. It is evident from the BJA Director's decision on remand, however, that the BJA equates "on duty" with being "on the clock." *See id.* at 3–5. The Director concluded that Officer Davis was not on duty at the time of his death because he because he had been discharged from work and was driving home under circumstances not covered by any of the BJA's "going and coming" rule exceptions. *Id.* at 4–5. The Director failed to consider, however, that Officer Davis was in fact still on the clock at the time of his death. On the night Officer Davis was killed, his superior .ordered him to leave work early to offset 30 minutes of uncompensated overtime. ER at 37–38. These 30 minutes of offset time began running at 1:00 a.m. and were still running at the time of Officer Davis's death at 1:12 a.m. *Id.* Officer Davis's pay records for that night show that he was compensated for this time. ER at 303, 37–38. The BJA Director likened this time to vacation time or sick leave. Remand Decision at 5. The fundamental difference between Officer Davis's offset time and vacation and sick leave time, however, is that Officer Davis was being compensated as an on duty officer, rather than for time designated for personal use. ER at 303, 313.

In limiting compensation to deaths in the line of duty, Congress focused on the deceased's status and activity at the time of death. Congress made no distinction about the person's location at the time of the fatal injury, including no requirement that the person be at work. Similarly, in the context of workers' compensation, courts have found employees to be actively on the clock and entitled to benefits even when injured away

from work. For instance, an employee injured off the employer's premises during a meal break may receive worker's compensation benefits, so long as the meal break is compensated. *Wood Pontiac Cadillac v. Superior Court,* 5 Cal.App.4th 810, 6 Cal. Rptr.2d 924, 925 (1992) ("[A]n employee's injuries while traveling to or from a compensated meal break are compensable whether the employee is paid at an hourly rate, or is salaried."); *Duncan v. Workers' Comp. Appeals Bd.,* 150 Cal.App.3d 117, 197 Cal.Rptr. 474, 476 (1983) (awarding benefits for off-premises injury because "under the going and coming rule, compensation will be awarded if the employee was being paid at the time he suffered the off-premises injury"). Another court found that an off-duty police officer died in the line of duty when he was killed in an automobile accident on his way to a court appearance, largely because the officer would have been compensated for his travel time. *Pounds v. Bd. of Trs. of Fire and Police Disability and Ret. Fund,* 89 Or.App. 552, 749 P.2d 1227 (1988). The important factor in each of these cases was that the worker received compensation for the time away from the workplace—just as Officer Davis was being compensated as he was driving home at the time of his death. When Congress defined "line of duty" as *"all* acts performed ... in the discharge of ... duties" (H.R. Conf. Rep. No. 94–1501, at 6, reprinted at 1976 U.S.C.C.A.N. at 2511 (emphasis added)), and as a "well established concept"— thereby invoking use of the term in workers' compensation law (*see, e.g. Yanco,* 2001 WL 826939, at *5; *Russell,* 637 F.2d at 1265; *Demutiis,* 48 Fed.Cl. at 92, n. 15)—it extended "line of duty" to circumstances where the employee is compensated, but not currently at work. By failing to consider that a person may be on the clock, and thus on duty, even when away from work, the BJA Director failed to give effect to Congress's definition of "line of duty."

The BJA Director also failed to consider that "on duty" is a different, and in many ways broader, concept than merely being "on

the clock." Congress defined the scope of "line of duty" by including "all acts performed by the public safety officer in the discharge of those duties which are required of him in his capacity as a law enforcement officer." H.R. Conf. Rep. No. 94–1501, at 6, reprinted at 1976 at 2511. Congress did not, however, require these "acts" to occur while the officer is being compensated.[8] This broader definition reflects the unique position of public safety officers who are often under a continuous duty to protect the public, even when not at work. Nonetheless, the BJA Director limited her consideration of off the clock compensable injuries to the going and coming rule and its exceptions. Remand Decision at 4–5.

The BJA Hearing Officer's initial determination cites *Russell v. Law Enforcement Assistance Admin.,* 637 F.2d 1255, as the source of the BJA's "going and coming" rule. ER at 514. A product of state workers' compensation law, the going and coming rule generally denies compensation for injuries suffered while en route to or from work. As stated by the Hearing Officer and applied by the Director, the BJA recognizes just three exceptions to this rule: when driving an employer's vehicle, when responding to a specific emergency, and when required to use one's personal vehicle at work. *See* ER at 514; Remand Decision at 4–5. As the Ninth Circuit observed in *Russell,* however, the going and coming rule is "riddled with exceptions" and "has evolved into a new rule which compensates injury where there is a sufficient nexus between the employment and the injury to conclude that it was a circumstance of employment." *Russell,* 637 F.2d at 1265. Several courts have recognized an exception to the going and coming rule for off duty police officers who are in uniform. This exception recognizes the benefit municipalities and the public derive from the mere presence of uniformed officers. *See Garzoli v. Workmen's Comp.App. Bd.,* 2 Cal.3d 502, 86 Cal.Rptr. 1, 467 P.2d 833, 835 (1970); *Jasaitis v. City of Paterson,* 31 N.J. 81, 155

---

**8.** The statute's implementing regulations also suggest a broader application of "line of duty" by including such informal activities as "social, ceremonial, or athletic functions to which the officer is assigned, *or* for which the officer is compensated" in its definition. 28 C.F.R. § 32.2(c)(1) (emphasis added).

A.2d 260, 262–63 (1959); *Carrillo v. Workers' Comp.App. Bd.*, 149 Cal.App.3d 1177, 197 Cal.Rptr. 425, 427–28 (1983). This exception would apply to Officer Davis since he was in uniform at the time of his death. ER at 33, 86. Courts have also recognized an exception to the going and coming rule where the employee is on-call, including police officers who are often expected to protect the public at all times. *See Tighe v. Las Vegas Metro. Police Dep't*, 110 Nev. 632, 877 P.2d 1032 (1994) (finding exception to going and coming rule for on-call employees, particularly police officers who are uniquely on call at all times); *City of Springfield v. Indus. Comm'n*, 244 Ill.App.3d 408, 185 Ill.Dec. 344, 614 N.E.2d 478, 480 (1993) (holding injuries compensable for police officer returning from lunch at home because the officer was on-call and available to respond "to any request for assistance or emergency he encountered"); *Hanstein v. City of Ft. Lauderdale*, 569 So.2d 493, 494 (Fla.Dist.Ct.App.1990) ("Because police officers are generally charged with a duty of law enforcement while traveling on public thoroughfares, it has long been established that injuries which such officers sustain while traveling to and from work may be compensated."). A court has also recognized an exception to the going and coming rule in part because the employee, at the time of the injury, was driving to an after work meal at the company's expense as an offset for unreimbursed overtime. *S. Bell Tel. & Tel. Co. v. Wallace*, 133 Ga.App. 213, 210 S.E.2d 347 (1974). By limiting her consideration to just three going and coming rule exceptions, the BJA Director failed to consider these or other recognized exceptions to the rule.

The common thread among all going and coming rule exceptions is that, in each instance, the employer derives a benefit from the employee's act of traveling to or from work. In the case of Officer Davis's death, the City of Seattle derived a benefit from Officer Davis's early departure from work by not having to pay him overtime, by having a uniformed officer on the streets, and by Officer Davis's vehicle stopping the fleeing suspect, Robert Duane Knowles. The BJA Director did not examine the benefit of Officer Davis's early departure or its bearing on the

going and coming rule. Moreover, as articulated by the court in *Russell*, the going and coming rule hinges not on the existence of defined exceptions, but on whether there is a nexus between the employment and the injury. Here, Officer Davis was driving home at the direction of his superior, in uniform, and in the process stopped a dangerously fleeing suspect. These circumstances combined may form a connection between Officer Davis's death and his employment as a police officer. By applying the going and coming rule without looking for this nexus, or for other going and coming rule exceptions, the BJA Director created a very narrow definition of "on duty"—a much narrower definition than Congress contemplated when limiting PSOBA benefits to line of duty deaths.

The BJA Director also failed to give effect to Congress's definition of "line of duty" by concluding that "[Officer Davis's] activity of driving home can not be considered in 'discharge of those duties which are required of him in his capacity as a law enforcement officer.'" Remand Decision at 4 (quoting H.R. Conf. Rep. No. 94–1501, at 6, reprinted at 1976 U.S.C.C.A.N. at 2511). Of course the PSOBA is not an insurance policy and certainly would not cover all conceivable injuries suffered by a police officer while commuting. But neither does the PSOBA and its term "line of duty" exclude all commuting injuries. There are circumstances where driving home can rise to the level of a discharge of police duties, especially where, as here, the officer contributes to the arrest of a suspect. Regardless of whether an officer is on duty, stopping a fleeing suspect falls within an officer's duties as "required of him in his capacity as a law enforcement officer." Police officers occupy a unique position because of their continuous duty to protect public safety. "'[W]hile the usual on-call employee is subject to the possibility of a special summons emanating directly from his employer, the policeman may be at any moment "called" into duty by events taking place in his presence, whether or not he is technically off duty.'" *Tighe*, 877 P.2d at 1035 (quoting 1 Arthur Larson, *Larson's Workmen's Compensation Law* § 16.17 (1993)). The Seattle

Police Department Manual specifically requires that

> [p]olice officers at all times, on or off duty, shall accept the responsibilities imposed upon them by law as to their duties and authority. When within the boundaries of the City, they shall preserve the public peace, detect and arrest violators of the law, prevent crime, protect life and property, and enforce the criminal laws of the State of Washington and the ordinances of the City of Seattle.

Pls.' Brief at 18 (quoting *Seattle Police Department Manual* § 1.08.020). As Officer Davis left the police station on the night he died, he was not simply a commuter driving home from work; he was commuter with a duty to be vigilant for any breach of the peace. At the instant Knowles approached at a dangerous speed, in flight from the state trooper, Officer Davis came under a duty to stop Knowles and prevent him from further endangering the public. This duty changed the character of Officer Davis's drive home from a commute to a police officer's duty obligation. When Knowles collided with Officer Davis in the intersection, an event that contributed significantly to Knowles's capture, Officer Davis effectively carried out his duty to protect the public. Congress explicitly extended "line of duty" to include "all acts performed by the public safety officer in the discharge of those duties which are required of him in his capacity as a law enforcement officer." H.R. Conf. Rep. No. 94–1501, at 6, *reprinted in* 1976 U.S.C.C.A.N. at 2511. Officer Davis, as a law enforcement officer, had a duty to stop Knowles, a duty that was fulfilled in the final moments of his life. The BJA Director, however, failed to consider this duty or whether Officer Davis's act of driving home could also qualify as an act in the line of duty when he stopped Knowles and contributed to his arrest. The BJA Director thus failed to give effect to Congress's definition of "line of duty." Since Congress, as evidenced by the legislative history, has defined "line of duty," *Chevron* requires that the court and the agency substantially comply with that definition. The BJA Director's decision does not give effect to Congress's definition, and therefore the decision does not pass the analysis required by step one of *Chevron*.

### 2. Chevron Step Two: Deference to Agency's Permissible Construction

Even if Congress, in the court's view, had not defined "line of duty" and the BJA Director's decision accordingly passed step one of *Chevron* analysis, the BJA's interpretation of the term would not warrant deference from the court in this case. When Congress is silent or ambiguous, a court will examine the agency's decision, keeping in mind principles of judicial deference. *Chevron*, 467 U.S. at 842–44, 104 S.Ct. 2778. The deference a court should afford an agency, however, is not absolute. Even if Congress had not spoken as clearly as the court believes Congress has spoken here through the Final Conference Report and Senate floor discussion, that silence alone would not preclude plaintiff's claim for PSOBA benefits.

In *Chevron*, the Supreme Court called for deference to an agency's statutory interpretation only when the interpretation is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. A court should accord deference when the issue "really centers on the wisdom of the agency's policy," but not necessarily where the issue is whether the agency's decision "is a reasonable choice within a gap left open by Congress." *Id.* at 866, 104 S.Ct. 2778. Nowhere in the opinion, though, does the Court suggest that courts should apply deference mechanistically, rubber stamping agency interpretations whenever the statute is silent or ambiguous. *Chevron* does not alter the Court's longstanding position that "it is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). Instead, *Chevron* creates a judicially self-imposed, prudential limitation on the court's interpretive authority. The Court in *Chevron* provided a list of instances where a court should elect to defer to an agency's reasonable decision, namely where "the regulatory scheme is technical and complex, the agency considered the matter in a detailed and reasoned fashion, and the decision involves reconciling conflicting policies." *Chevron*, 467 U.S. at 865, 104 S.Ct.

2778. By considering these factors, as well as principles of "reasonableness" and "permissible construction," the Court did not impose a bright line rule of deference to all agency decisions. Rather, *Chevron* deference is appropriate where a court determines that the circumstances warrant relinquishing its own interpretive authority in deference to an agency's decision.

Since *Chevron*, the Supreme Court has had several opportunities to reiterate and refine its rule of *Chevron* deference and the circumstances in which a court should choose to impose it. The Court has determined that while a court may apply Chevron deference to an agency's interpretation of a statute, deference does not apply to an agency's regulations or documents that lack the force of law such as opinion letters or policy statements. *United States v. Mead*, 533 U.S. 218, ———, 121 S.Ct. 2164, 2175, 150 L.Ed.2d 292 (2001) (holding that Customs Service tariff classification ruling letters are not entitled to *Chevron* deference); *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (stating that "the framework of deference set forth in Chevron does apply to an agency interpretation contained in a regulation" but "[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference").

■ The Supreme Court has also emphasized the need for courts to apply the reasonableness test before deferring to an agency's decision. *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 627, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986) ("[T]he mere fact that there is 'some rational basis within the knowledge and experience of the [regulators]' under which they 'might have concluded' that the regulation was necessary to discharge their statutorily authorized mission will not suffice to validate agency decisionmaking.") (citations omitted). It is incumbent upon the agency to explain the reasonableness of its decision. *Id.* at 627, 106 S.Ct. 2101 (observing that although an agency's judgment is always deserving of "respect," deference requires "the

agency to explain the rationale and factual basis for its decision"). A court will determine an agency's interpretation to be reasonable only when Congress has specifically charged the agency with administering the statute. *United States v. Mead*, 533 U.S. 218, ———, 121 S.Ct. 2164, 2171, 150 L.Ed.2d 292 (holding that an agency's interpretation qualifies for deference only "when it appears that Congress delegated authority to the agency generally to makes rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority"); *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n. 9, 117 S.Ct. 1953, 138 L.Ed.2d 327 (1997) (holding that an agency decision is unreasonable where the agency is not specifically charged with administering the statute). The agency's interpretation must also follow logically from the text of the statute. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 121 S.Ct. 903, 918–19, 149 L.Ed.2d 1 (2001) (stating that deference was not appropriate for an agency decision that "construe[d] the statute in a way that completely nullifies textually applicable provisions meant to limit [the agency's] discretion"); *Metro. Stevedore Co.*, 521 U.S. at 137 n. 9, 117 S.Ct. 1953 (holding that an agency decision is unreasonable when it relies on a logical fallacy).

The Supreme Court has taken several other factors into account when deciding whether deference is appropriate. The Court has drawn distinctions between a "question of interpretation ... [when] the agency is required to apply [a legal standard] to a particular set of facts" and "a pure question of statutory construction." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446–48, 107 S.Ct. 1207, 94 L.Ed.2d 434. The former question may warrant deference to the agency's answer, but the latter is a question "for the courts to decide." *Id.* at 447–48, 107 S.Ct. 1207. The court has also considered the longevity and consistency of an agency's interpretation. *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993) ("[T]he consistency of an agency's position is a factor in assessing the weight that position is due."); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("Def-

erence to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."); *NLRB v. United Food & Commercial Workers Union,* 484 U.S. 112, 124 n. 20, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987) (stating that a court should "consider the consistency with which an agency interpretation has been applied, and whether the interpretation was contemporaneous with the enactment of the statute being construed"); *INS v. Cardoza–Fonseca,* 480 U.S. at 447 n. 30, 107 S.Ct. 1207 (1987) (stating that "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view") (quoting *Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981)); *Bowen v. Am. Hosp. Ass'n,* 476 U.S. at 646, n. 34, 106 S.Ct. 2101 (stating that the case for deference is diminished where "the agency's interpretation 'has been neither consistent nor long standing'" (quoting *Southeastern Cmty. Coll. v. Davis,* 442 U.S. 397, 412 n. 11, 99 S.Ct. 2361, 60 L.Ed.2d 980)); *United States Dep't of Transp. v. Paralyzed Veterans of Am.,* 477 U.S. 597, 612–13 n. 14, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986) (suggesting that deference is appropriate for longstanding agency interpretations). An agency is of course free to change its interpretation of a statute, but changes that are sudden and unexplained or that do not account for reliance on the agency's prior interpretation should give a court pause before it decides to defer to an agency's decision relying on that interpretation. *Smiley v. Citibank (S.D.) N.A.,* 517 U.S. 735, 742, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996). And where an agency decision raises constitutional issues or pushes the limits of Congressional power, the Court has construed the relevant statutes to avoid those constitutional issues rather than deferring to the agency's decision. *Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs,* 531 U.S. 159, 121 S.Ct. 675, 683, 148 L.Ed.2d 576 (2001) (stating that "[w]here an administrative interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result" before considering deference to the administrative interpretation);

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (applying the principle that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems" and avoid extending *Chevron* deference).

The rule of deference that emerges from the *Chevron* line of cases is a rule of broad application with an extensive, but not exhaustive, catalog of limitations. A court should not relinquish its adjudicative authority and defer to an agency decision when that decision is not reasonable or logical (*Metro. Stevedore Co.,* 521 U.S. at 137, 117 S.Ct. 1953; *Chevron,* 467 U.S. at 866, 104 S.Ct. 2778), when the agency fails to explain its rationale (*Bowen v. Am. Hosp. Ass'n,* 476 U.S. at 627, 106 S.Ct. 2101; *Chevron,* 467 U.S. at 865, 104 S.Ct. 2778), when the decision involves a pure question of law (*Cardoza–Fonseca,* 480 U.S. at 446, 107 S.Ct. 1207), when the agency is not specifically charged with interpreting the statute (*Mead,* 533 U.S. at ——, 121 S.Ct. at 2171; *Metro. Stevedore Co.,* 521 U.S. at 137, 117 S.Ct. 1953), or when the agency's interpretation derives from an opinion letter, policy statement, or other agency materials (*Mead,* 533 U.S. at ——, 121 S.Ct. at 2171; *Christensen,* 529 U.S. at 587, 120 S.Ct. 1655). When deciding whether deference is appropriate, courts should also consider the agency's expertise (*Chevron,* 467 U.S. at 865, 104 S.Ct. 2778), the consistency and longevity of its position (*Bowen v. Am. Hosp. Ass'n,* 476 U.S. at 646 n. 34, 106 S.Ct. 2101), and whether the interpretation involves avoidable constitutional problems (*Solid Waste Agency of N. Cook County,* 121 S.Ct. at 683; *Edward J. DeBartolo Corp.,* 485 U.S. at 575, 108 S.Ct. 1392). As these limitations demonstrate, *Chevron* deference is neither automatic nor absolute. Before deferring to an agency's decision, a court should consider these or other appropriate factors to determine if the circumstances of the case warrant deference to the agency's statutory interpretation. *See Mead,* 533 U.S. at ——, 121 S.Ct. at 2171 ("The fair measure of deference to an agency administering its

own statute has been understood to vary with circumstances."), 121 S.Ct. at 2176 n. 18 ("Judges ... will make reasoned choices between [the extreme cases where deference is or is not warranted], the way courts have always done.").

The Federal Circuit has characterized *Chevron* deference as "a limited relinquishment of judicial power to declare what the law is." *Federal–Mogul Corp. v. United States*, 63 F.3d 1572, 1579 (Fed.Cir.1995). Accordingly, the Federal Circuit has observed that *Chevron* deference is not appropriate where the agency's interpretation is not reasonable (*Wassenaar v. Office of Pers. Mgmt.*, 21 F.3d 1090 (Fed.Cir.1994); *Gannet v. United States*, 877 F.2d 965, 968 (Fed.Cir. 1989)), where Congress has not given the agency rulemaking power (*Merck & Co., Inc. v. Kessler*, 80 F.3d 1543, 1549 (Fed.Cir.1996); *Federal–Mogul Corp.*, 63 F.3d at 1579), or where the interpretation is not longstanding or in accordance with the agency's own regulations (*Torrington Co. v. United States*, 82 F.3d 1039, 1049 (Fed.Cir.1996); *Parker v. Office of Pers. Mgmt.*, 974 F.2d 164, 166 (Fed.Cir.1992)).

*Chevron* deference does apply to interpretations embodied in regulations or agency materials. *Christensen*, 529 U.S. at 587, 120 S.Ct. 1655. Since plaintiff challenges the BJA Director's decision, not the interpretation embodied in the PSOBA implementing regulation, 28 C.F.R. § 32.2(c)(1), however, the court will not examine whether it should defer to the regulation. Nor will the court examine whether it should defer to the agency memorandum adopting the "going and coming" rule, *see* Remand Decision at 4 (citing OGC Memorandum dated April 14, 1981 in Legal Interpretations of the Public Safety Officers Benefits Act, U.S. Department of Justice (November 1981) at 111), because *Chevron* does not apply to agency materials. *Mead*, 533 U.S. at ——, 121 S.Ct. at 2171; *Christensen*, 529 U.S. at 587, 120 S.Ct. 1655. Instead the court will examine the BJA Director's interpretation of the PSOBA itself to determine if that interpretation is reasonable and deserving of the court's deference.

Several factors in this case would support deference to the BJA Director's decision.

The BJA is charged with applying the PSOBA. 42 U.S.C. § 3796; *see, e.g. Mead*, 533 U.S. at ——, 121 S.Ct. at 2171 (stating that deference is not appropriate where agency is not charged with applying the relevant statute); *Metro. Stevedore Co.*, 521 U.S. at 137, 117 S.Ct. 1953 (same); *Merck & Co.*, 80 F.3d at 1549 (same); *Federal–Mogul Corp.*, 63 F.3d at 1579 (same). To the court's knowledge, the BJA Director's interpretation of "line of duty" does not represent a recent shift in BJA policy. *See, e.g., Bowen v. Am. Hosp. Ass'n*, 476 U.S. at 646 n. 34, 106 S.Ct. 2101 (considering the longevity of the agency's position); *Parker*, 974 F.2d at 166 ("[P]ost hoc rationalizations will not create a statutory interpretation deserving of deference."). The decision also does not appear to create any constitutional problems for the court to avoid. *See, e.g., Edward J. DeBartolo Corp.*, 485 U.S. at 575, 108 S.Ct. 1392 (avoiding deference to interpretations that raise constitutional problems); *Solid Waste Agency of N. Cook County*, 121 S.Ct. at 683 (same).

As the BJA Director acknowledges, though, the question of whether Officer Davis was "on duty," and thus killed in the line of duty, is a question of law, not fact. Remand Decision at 4. "Line of duty" is a legal concept and determining whether the established facts of Officer Davis's death fall within that concept is a purely legal determination. While Supreme Court precedent would authorize a court to defer to an agency decision that involves a question of fact or mixed question of law and fact, pure questions of law fall exclusively within the court's power to say what the law is. *Cardoza–Fonseca*, 480 U.S. at 446, 107 S.Ct. 1207. To the extent the BJA Director's decision involves a pure question of law, the court may not choose to defer to the agency's decision.

More importantly, the court should not defer to the BJA Director's decision if it is unreasonable. *See Chevron*, 467 U.S. at 866, 104 S.Ct. 2778. To determine whether an agency's interpretation is reasonable, a court should look to the text of the statute, the overall structure of the statute, the statute's purpose, and the legislative history. *See, e.g., Your Home Visiting Nurse Servs.*

*Inc. v. Shalala*, 525 U.S. 449, 452–57, 119 S.Ct. 930, 142 L.Ed.2d 919 (1999) (comparing purpose of statutory provision with provision of other relevant statute); *Smiley*, 517 U.S. at 745, 116 S.Ct. 1730 (examining judicial, common usage, and legal dictionary definitions of statutory term); *Babbitt v. Sweet Home Chapter of Cmties. for a Great Ore.*, 515 U.S. 687, 697–704, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (examining dictionary definition of key term, overall statutory purpose and structure, and legislative history); *Rust*, 500 U.S. at 184–85, 188–90, 111 S.Ct. 1759 (examining text of statute, legislative history, and congressional intent); *Wassenaar v. Office of Pers. Mgmt.*, 21 F.3d at 1092–96 (examining legislative history, purpose, and text of statute); *Gannet*, 877 F.2d at 967–68 (examining legislative history and text of statute). If the agency's interpretation is a reasonable and permissible construction of the statute, then the court should consider deferring to the agency's decision.

■ The text of the PSOBA specifies that the BJA shall pay benefits to "a public safety officer [who] has died as the direct and proximate result of a personal injury sustained in the line of duty." 42 U.S.C. § 3796(a). The BJA Director interprets this language, in particular the term "line of duty," to exclude benefits for a public safety officer killed by a fleeing suspect while the officer is driving home early to offset uncompensated overtime. Remand Decision at 3–5. To determine whether the BJA Director's interpretation is permissible, the court "need not conclude that the agency construction was the only one it permissibly could have adopted ... or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843, n. 11, 104 S.Ct. 2778. The agency's interpretation should, however, fall within the ambit of the statute's text. The word "duty" connotes a legal or moral obligation. In reference to public safety officers, "duty" refers to the obligation to protect the public in their capacity as firefighters or police officers. The term "in the line of duty," then, suggests some sort of connection between the injury and the public safety officer's duty. The BJA Director interprets "line of duty" to require a particular type of connection between the injury and the duty, namely that the deceased officer was actively on duty or engaged in a specific line of duty action. Remand Decision at 3. The text of the PSOBA does not contradict or preclude this interpretation, and so the BJA Director's decision is not unreasonable based solely on the text of the statute.

The legislative history, however, does not support the BJA Director's interpretation of "line of duty." As discussed earlier, Congress invoked the well established concept of "line of duty" in workers' compensation law and other relevant statutes when using "line of duty" in the PSOBA. *See, e.g.*, H.R. Conf. Rep. No. 94–1501, at 6, *reprinted in* U.S.C.C.A.N. at 2511. The definition of "line of duty" that emerges from the legislative history, therefore, is one closely akin to "on duty," including duties performed while not on the clock. Notwithstanding Congress's intent, the BJA Director applied a "going and coming" rule that is narrower than the going and coming rule in state workers' compensation law. *See* Remand Decision at 4. In defining "line of duty" in the PSOBA, as well as in other contexts to which the Final Conference Report refers, H.R. Conf. Rep. No. 94–1501, at 6, *reprinted in* U.S.C.C.A.N. at 2511, Congress emphasized the nature of the duty, not its timing or the manner of its performance. The BJA Director, however, focused on the timing of Officer Davis's death, equating "on duty" with being "on the clock." *See* Remand Decision at 5. By analyzing the PSOBA and "line of duty" in a way that is not supported by or consistent with the legislative history, the BJA Director rendered a decision that is not reasonable.

Moreover, the overall purpose of the PSOBA is not only to compensate the survivors of officers killed while on duty, but also to recognize the extraordinary risks those officers face and provide an incentive to become and remain a public safety officer. In the course of adopting the statute, Congress observed that .

> The motivation for this legislation is obvious: The physical risks to public safety officers are great; the financial and fringe benefits are not usually generous; and the

officers are generally young with growing families and heavy financial commitments. The economic and emotional burden placed on the survivors of a deceased public safety officer is often very heavy.

The dedicated public safety officer is concerned about the security of his family, and to provide the assurance of a Federal death benefit to his survivors is a very minor recognition of the value our government places on the work of this dedicated group of public servants.

S.Rep. No. 94–816, at 3–4, reprinted in 1976 U.S.C.C.A.N. at 2505. *See also Demutiis,* 48 Fed.Cl. at 85–86. The grave physical risks facing public safety officers are imminent whenever an officer is under a duty to take actions to protect the public. For officers who are under such a duty at all times, the potential for physical risk pervades their daily lives, both on and off the clock. Placing officers under such a continuous duty with its inherent risks confers a significant benefit on society. In exchange, the PSOBA rewards officers with the peace of mind that their survivors shall be provided for should the risks ever prove fatal. The PSOBA benefits also, to some extent, compensate the survivors for the loss of their spouse of parent to a line of duty death. By denying benefits because Officer Davis was driving home at the time of his death under circumstances not within her articulation of the going and coming rule, the BJA Director narrowed the scope of risks that the PSOBA rewards. This narrower scope does not comport with the overall purpose of the PSOBA. The more narrowly the PSOBA applies, the less effective a tool it is for recruiting and retaining public safety officers or rewarding them for protecting the public at great personal risk. And the fewer the circumstances the BJA deems to be in the "line of duty," the fewer survivors of public safety officers the PSOBA will compensate for their loss. The BJA Director's narrow interpretation of "line of duty" thus goes against the overall purpose of the PSOBA, making the Director's decision appear unreasonable to the court.

Because the BJA Director's interpretation of "line of duty" involves a pure question of law, it is a question for the court to address

without deference to the agency. Moreover, the BJA Director's interpretation of "line of duty" contradicts the legislative history of the PSOBA and goes against the statute's overall purpose. The BJA Director's interpretation of "line of duty" as it applies to Officer Davis is therefore not a reasonable interpretation of the PSOBA. Because the Director's decision is unreasonable and involves a pure question of law, the court should not defer to the Director's interpretation of "line of duty" under step two of *Chevron* analysis.

### C. Compliance With Regulations

 The PSOBA specifies that the BJA will make its benefit determinations "under regulations issued pursuant to this subchapter." 42 U.S.C. § 3796(a) (2001). Plaintiffs argue that the BJA failed to comply with the PSOBA implementing regulations by not giving substantial weight to the findings of state and local agencies and by not applying the reasonable doubt rule. Amended Complaint ¶¶ 29–30. The two-step *Chevron* analysis does not apply to an agency's interpretation of its own regulation unless the language of the regulation is ambiguous. *See Christensen,* 529 U.S. at 588, 120 S.Ct. 1655. Rather a court should accord an agency's interpretation "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); *see also Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79, (1997); *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). An agency's interpretation does not command deference, however, when the regulation's plain language compels an alternative interpretation. *Thomas Jefferson Univ.,* 512 U.S. at 512, 114 S.Ct. 2381; *Martin v. Occupational Safety and Health Review Comm'n,* 499 U.S. 144, 150–51, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991).

#### 1. State and Local Administrative and Investigative Agencies

 One of its PSOBA regulations requires the BJA to give "substantial weight to

the evidence and findings of fact presented by State, local, and Federal administrative and investigative agencies." 28 C.F.R. § 32.5 (2001). Washington state law provides a pension for survivors of police officers who lose their lives "while actually engaged in the performance of duty, or as the proximate result thereof." Wash. Rev.Code § 41.20.080 (2000). Washington law also provides a death benefit, similar to that provided by the PSOBA, for officers who die "as a result of injuries sustained in the course of employment." Wash. Rev.Code § 41.26.048 (2000). Upon investigation of Officer Davis's death, the Seattle Police Department determined that Officer Davis was on duty at the time of his death and thus eligible for state benefits. ER at 312–14, 351. The Board of Trustees of the Seattle Police Relief and Pension Fund (Board of Trustees) also awarded Officer Davis's family these state benefits after determining that Officer Davis died "as a proximate result of the performance of his duties as an active duty police officer of the City of Seattle." *Id.* at 329 (Minutes of the Regular Monthly Meeting of the Board of Trustees of the Seattle Police Relief and Pension Fund on May 28, 1996). Under C.F.R. § 32.5, the BJA must give "substantial weight" to these determinations. The BJA Director, however, makes no mention of the Board of Trustees' or Seattle Police Department's decisions.

The BJA Hearing Officer did address the Board of Trustees' decision, as well as state workers' compensation law precedent, but afforded them no weight, let alone substantial weight. *See* ER at 528–29. Furthermore, the Hearing Officer dismissed the workers' compensation cases plaintiffs cited based on a statement in *Tafoya v. United States*, 8 Cl.Ct. 256 (1985), that "the 'line of duty' provision in the PSOBA is not *necessarily* as broad as the 'scope of employment' standard utilized in state workers' compensation laws.'" *Tafoya*, 8 Cl.Ct. at 263 (emphasis added) (quoted by Hearing Officer, ER at 528). Apparently guided by the quoted statement from *Tafoya* indicating that a state standard *may* be broader than the PSOBA standard, the Hearing Officer assumed that the Washington state standard *was* broader than the PSOBA. ER at 528.

The Hearing Officer also dismissed the Board of Trustees' decision based on *Tafoya* and the assumption that the state standard was not as narrow as the PSOBA. *Id.* at 528–29. Washington state law, however, uses a "line of duty" standard that is quite similar to the federal standard. Washington state law provides a pension when a police officer dies "while actually engaged in the performance of duty," Wash. Rev.Code § 41.20.080, and a death benefit when the officer's death occurs "as a result of injuries sustained in the course of employment," Wash. Rev.Code § 41.26.048. Based on the text, there is little discernible difference between "in the line of duty" in the PSOBA and "while actually engaged in the performance of duty" in the Washington state statute, except that the state standard may actually be narrower. While it might be possible to construe the phrase "in the course of employment" in § 41.26.048 more broadly than "in the line of duty" in the PSOBA, Washington state courts have concluded that "course of employment," as used in the state statute, is equivalent to "line of duty." *Dillon v. Seattle Police Pension Bd.*, 82 Wash.App. 168, 916 P.2d 956, 958 (1996). The Hearing Officer's assumption that the Washington standard is narrower than the PSOBA standard is in error. The Hearing Officer and BJA Director's failure to accord substantial weight to the Board of Trustees' and Seattle Police Department's decisions contradicts the plain language of PSOBA regulation 28 C.F.R. § 32.2(c)(1), and therefore may not be accorded "controlling weight" by this court. *See Bowles v. Seminole Rock & Sand Co.*, 325 U.S. at 414, 65 S.Ct. 1215.

### 2. Reasonable Doubt

█ Plaintiff also alleges that the BJA failed to comply with the PSOBA and its regulations by not applying the reasonable doubt rule. Pls.' Brief at 42–43. The PSOBA regulations specify that "[t]he Bureau shall resolve any reasonable doubt arising from the circumstances of the officer's death . . . in favor of payment of the death . . . benefit." 28 C.F.R. § 32.4. The BJA Director, however, determined that because she had concluded that Officer Davis was "clearly

not on-duty and was not engaged in a specific law enforcement activity at the time of his death, the application of the 'reasonable doubt' rule . . . need not be addressed." Remand Decision at 6.

The BJA Director interprets the reasonable doubt rule to apply only to cases where an officer is deemed to be "on duty" or where there is evidence the officer took a law enforcement action so as to revert to duty status. Remand Decision at 6. The language of the regulation, however, applies to "*any* reasonable doubt arising from the circumstances of the officer's death," 28 C.F.R. § 32.4 (2001) (emphasis added), not merely reasonable doubts about deaths of on duty officers. *See Demutiis*, 48 Fed.Cl. at 88–90 (discussing the text of § 32.4 and concluding that it applies to all questions of fact). The only question of fact to which the reasonable doubt rule would not apply is one where there is insufficient evidence for the finder of fact to formulate a reasonable doubt. *Tafoya*, 8 Cl.Ct. at 264.

According to the BJA Director, her conclusions that Officer Davis was not on duty or engaged in a specific law enforcement activity were conclusions of law. Remand Decision at 6. The question of whether an officer is "on duty" or whether an action qualifies as a "specific law enforcement activity" is certainly a question of law. The question of whether an officer is *engaged* in an activity that as a matter of law would qualify as a duty or law enforcement activity, however, is a question of fact.

Stopping a suspect fleeing at a dangerous speed through a city street is clearly a law enforcement activity. As plaintiff points out, the Seattle Police Department Manual specifically includes "detect[ing] and arrest[ing] violators of the law" and "protect[ing] life and property" among the duties that officers must observe, regardless of whether or not they are on duty. Pls.' Brief at 18 (quoting Seattle Police Department Manual § 1.08.020). The question is not whether stopping Knowles qualifies as a law enforcement or duty activity, but whether Officer Davis was stopping Knowles at the time of his death. The BJA Director states that it would be impossible to determine whether

Officer Davis was participating in a law enforcement action because his actions preceding his death are unknown. Remand Decision at 6. However, unlike the *Tafoya* case—where virtually nothing was known about the circumstances under which the officer was killed—much is known about the events leading up to Officer Davis's death. We know that Officer Davis's car was at the intersection of North 107th Street and Meridian Avenue North when Knowles approached. ER at 30. From reconstruction of the accident, we know Knowles was driving at an approximate rate of 66 miles per hour in a 25 miles per hour zone, a speed at which his vehicle would have been remarkably audible. ER at 81–82, 256. We know that as Knowles and Officer Davis came within a distance to detect each other's vehicles, Knowles had time to hit his brakes. ER at 119–20. The physical evidence shows, however, that Officer Davis proceeded through the intersection at approximately 31 miles per hour and made no attempt to brake. ER at 81, 119–20. Despite braking, Knowles collided at a 90 degree angle with the right front corner of Officer Davis's car. ER at 70–71. The impact spun Officer Davis's car and threw him from the passenger side window onto the pavement, suggesting he was not wearing his seatbelt. ER at 75, 78. Eye witnesses report that after the accident, Knowles exited his vehicle, ran past Officer Davis's uniformed body, and yelled "You fucking cops aren't going to get me," before fleeing the scene. ER at 103–04. We also know that Officer Davis habitually wore his seatbelt, but that it was a practice among more experienced officers to release their belts upon approaching a scene to allow for a hasty exit. ER at 257–58. Officer Davis had a history of taking police action while off duty as well, including an incident where he stopped a fleeing suspect by intentionally ramming the suspect's car to disable it. ER at 127–29, 158–65, 187–88, 194–96, 234–37. While certain details of the accident remain a mystery, this is not a case where evidence is "wholly lacking," as the BJA Director states. Remand Decision at 6. The primary missing detail is whether Officer Davis purposely or coincidentally collided with Knowles. However, as this court has stated, and the BJA

Director has agreed, the PSOBA does not require an officer to be aware he or she is taking a law enforcement action. *Davis,* 46 Fed.Cl. at 427, Remand Decision at 6. Officer Davis's state of mind at the time of the accident is therefore irrelevant. The relevant, undisputed facts that are known are sufficient as a matter of law to develop a reasonable doubt regarding the circumstances of Officer Davis's death and whether they involved a law enforcement action. The BJA Director's failure to consider applying the reasonable doubt rule and resolving any reasonable doubt in Officer Davis's favor is inconsistent with the plain language of 28 C.F.R. § 32.4, and therefore may not be accorded "controlling weight." *See Bowles v. Seminole Rock & Sand Co.,* 325 U.S. at 414, 65 S.Ct. 1215.

### III. Motion for Partial Relief from Remand Order

Defendant moves for partial relief from the court's March 31, 2000 remand order to the extent that the court treated footnote 6 of *Budd v. United States,* 225 Ct.Cl. 725, as non-precedential. Def.'s Mot. Relief at 1. In its remand order, the court referred to *Budd* as an unpublished opinion. *Davis,* 46 Fed.Cl. at 424, n.3. To clarify, *Budd* appears as an unpublished table opinion at 650 F.2d 290 (1980). The text of the opinion, however, appears in the Court of Claims Reporter at 225 Ct.Cl. 725 (1980). An examination of the original case file reveals no intention by the court to file *Budd* as an unpublished opinion. This court has adopted as binding precedent all published holdings of its predecessor, the United States Court of Claims. General Order No. 1; *see also South Corp. v. United States,* 690 F.2d 1368, 1370 (Fed.Cir.1982) (adopting Court of Claims holdings as precedent). The court erred in its earlier opinion when it referred to *Budd* as unpublished.

The court's conclusion that it erred in referring to *Budd* as unpublished does not, however, change the court's view that *Budd* footnote 6 does not represent binding precedent. Footnote 6 characterizes "line of duty" in the PSOBA as requiring "more than that death occur while an officer is at work," and turning on "whether the specific activity causing death was an inherent part of employment of an officer." *Budd,* 225 Ct.Cl. at 727 n. 6. This statement, however, is dicta and not the holding of the case. Only holdings of the Court of Claims are binding precedent on this court. *South Corp.,* 690 F.2d at 1370. Moreover, footnote 6 relies on the language of Senate Report 94–816 which was later superseded by the text of the PSOBA. *Budd,* 225 Ct.Cl. at 727 n. 6; *Davis,* 46 Fed.Cl. at 425. Because the text of the bill accompanying Senate Report 94–816 is different from the text of the PSOBA as adopted by Congress, analysis of the Senate Report does not provide binding precedent for interpreting the PSOBA. Because footnote 6 consists of dicta of the Court of Claims that erroneously relies on the text of a superseded bill, the court denies relief from its remand order regarding the precedential value of *Budd.* To the extent that the remand order referred to Budd as "unpublished," 46 Fed.Cl. at 424 n.3, and only to that extent, the remand order is hereby corrected by reference.

### IV. Conclusion

The court finds that the BJA Director did not substantially comply with the PSOBA in her interpretation of the term "line of duty" and failed to comply with the PSOBA regulations by not according substantial weight to the findings of state and local investigative agencies and by not applying the reasonable doubt rule. The court determines, based on its review of the BJA Director's decision, that Officer Davis was killed in the line of duty. His widow and child are therefore entitled to benefits under the PSOBA.

For the foregoing reasons, plaintiffs' motion for summary judgment is GRANTED. Defendant's cross-motion for summary judgment is DENIED. Defendant's motion for partial relief from the remand order is GRANTED IN PART and DENIED IN PART. The Clerk of the Court shall enter judgment for plaintiff in the amount of $100,000.

IT IS SO ORDERED.