**COMMONWEALTH EDISON
CO., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 98–621 C.

United States Court of Federal Claims.

June 10, 2003.

David A. Handzo, Washington, DC for plaintiff. Donald R. Cassling, Norman M. Hirsch, David Jiménez–Ekman, Thomas S. O'Neill, and Jennifer L. Vance, Chicago, IL, of counsel.

Harold D. Lester, Jr., with whom were Robert D. McCallum, Jr., Assistant Attorney General, and David M. Cohen, Director, Civil Division, U.S. Department of Justice, Washington, DC for defendant. Bryant S. Banes, Kevin B. Crawford, Heide L. Herrmann, Timothy P. McIlmail, R. Alan Miller, William L. Olsen, Erin E. Powell, Stefan Shaibani, Russell A. Shultis, Victoria Strohmeyer, Marian E. Sullivan, Elizabeth Thomas, and Franklin E. White, Washington, DC, of coun-

sel. Martha S. Crosland, L. Dow Davis, IV, and Jane K. Taylor, U.S. Department of Energy, Washington, DC, of counsel.

### OPINION AND ORDER

HEWITT, Judge.

Plaintiff Commonwealth Edison Company (ComEd) seeks damages from defendant for partial breach of a contract to dispose of nuclear waste that had been produced at plaintiff's nuclear power plants. *See* Complaint (Compl.) ¶¶ 35–38. Plaintiff also seeks damages for the taking of its real property without just compensation. *See* Compl. ¶¶ 48–51. Defendant moves for partial summary judgment on the issue of defendant's obligation to dispose of Greater Than Class C radioactive waste (GTCC waste)[1] and on the issue of the rate and order of acceptance of spent nuclear fuel (SNF) and high-level radioactive waste (HLW).[2] Defendant also moves to dismiss plaintiff's taking claim pursuant to Rule 12(b)[(6)[3]] of the Rules of the United States Court of Federal Claims (RCFC).[4] *See* Defendant's Motion to Dismiss Count II and IV of Plaintiff's Complaint (Def.'s Takings MTD) at 13–15.

**1.** For convenient reference, frequently reappearing abbreviations of terms in the Standard Contract, in alphabetical order, are: 1995 Annual Capacity Report and Acceptance Priority Ranking (1995 ACR/APR), Annual Capacity Report (ACR), delivery commitment schedules (DCSs), final delivery schedules (FDSs), Greater Than Class C radioactive waste (GTCC waste), high-level radioactive waste (HLW), Metric Tons Uranium (MTU), Nuclear Regulatory Commission (NRC), and spent nuclear fuel (SNF).

**2.** The court has before it Defendant's Motion for Partial Summary Judgment Regarding the Rate of Spent Nuclear Fuel Acceptance (Def.'s SNF Mot.), Plaintiff's Memorandum in Opposition to Defendant's Motion for Partial Summary Judgment Regarding the Rate of Spent Nuclear Fuel Acceptance (Pl.'s SNF Resp.), Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment Regarding the Rate of Spent Nuclear Fuel Acceptance (Def.'s SNF Reply), Defendant's Motion for Partial Summary Judgment Regarding Plaintiff's Greater than Class C Radioactive Waste Arguments (Def.'s GTCC Mot.), Plaintiff's Memorandum in Opposition to Defendant's Motion for Partial Summary Judgment Regarding Plaintiff's Greater than Class C Radioactive Waste Arguments

### I. Background[5]

In 1982, Congress enacted the Nuclear Waste Policy Act (NWPA) because of concerns over the disposal of nuclear waste accumulating at nuclear power plants. 42 U.S.C. §§ 10101–10270 (1994). The NWPA authorized the Secretary of the Department of Energy (DOE) to enter into contracts with utilities for the disposal of SNF and high-level radioactive waste. *See* 42 U.S.C. § 10222(a)(1). The NWPA required that all contracts "shall provide that" the Department will dispose of the waste "beginning not later than January 31, 1998," *id.* § 10222(a)(5)(B). The NWPA also "effectively made entry into such contracts mandatory for the utilities by prohibiting the Nuclear Regulatory Commission [(NRC)] from issuing licenses to any operator who has not 'entered into a contract with the Secretary' or who 'is [not] actively and in good faith negotiating with the Secretary for a contract.'" *Maine Yankee*, 225 F.3d at 1337 (quoting 42 U.S.C. § 10222(b)(1)(A) (1994)).

DOE implemented the statute by promulgating the Standard Contract for Disposal of Spent Nuclear Fuel (Standard Contract). 10 C.F.R. § 961.11 (1983). Article VIII of the Standard Contract requires utilities to pay a

(Pl.'s GTCC Resp.), and Defendant's Reply to Plaintiff's Response to Defendant's Motion for Partial Summary Judgment Regarding Greater than Class C Radioactive Waste Arguments (Def.'s GTCC Reply).

**3.** Rule 12(b)(4) became Rule 12(b)(6) as a result of a revision of the Rules of the United States Court of Federal Claims, effective May 1, 2002.

**4.** In response to defendant's motions to dismiss Counts II (taking of vested contract rights) and III (illegal exaction) of plaintiff's complaint, *see* Defendant's Motion to Dismiss Count II and IV of Plaintiff's Complaint (Def.'s Takings MTD) at 7–13 and Defendant's Motion to Dismiss Count III of Plaintiff's Complaint (Def.'s Illegal Exaction MTD), plaintiff conceded that Counts II and III of its complaint should be dismissed. *See* Plaintiff's Response to Defendant's Motions to Dismiss Counts II, III and IV of Plaintiff's Complaint (Pl.'s MTD Resp.) at 1. Therefore, defendant's motions to dismiss Counts II and III of plaintiff's Complaint are GRANTED.

**5.** The background facts of this case are well known. *See Maine Yankee Atomic Power Co. v. United States,* 225 F.3d 1336 (Fed.Cir.2000).

one-time fee, based on the amount of electricity generated prior to April 7, 1983, and an ongoing fee based on the amount of electricity generated thereafter. *See* Appendix to [Pl.'s SNF Resp.] (Pl.'s SNF App.) at 307.[6] In exchange for the fees, DOE was required to take title to, transport, and dispose of the nuclear waste stored at the utilities' facilities beginning "not later than January 31, 1998." Pl.'s SNF App. at 296.

ComEd is an electric utility that owns several nuclear electricity generating facilities. *See* Compl. ¶ 3. ComEd entered into the Standard Contract with defendant on July 17, 1983. *See id.* ¶ 12. In 1994, DOE announced that it could not begin disposing of nuclear waste by January 31, 1998 because the repository that it planned to build to store the waste would not be available until at least 2010. *See* Notice of Inquiry, 59 Fed.Reg. 27,007, 27,007–08 (1994); *see also* April 29, 2003 Oral Argument Transcript (Tr.) at 63. In *Maine Yankee*, the United States Court of Appeals for the Federal Circuit (Federal Circuit) held that DOE had breached the Standard Contract by not beginning to accept, transport, and dispose of SNF by the deadline of January 31, 1998. *See Maine Yankee*, 225 F.3d at 1343. On August 1, 2001, this court granted plaintiff's motion for partial summary judgment on the issue of liability for breach of contract, pursuant to Rule 56(c) of the United States Court of Federal Claims. *See* Order dated August 1, 2001. The court now considers defendant's motion to dismiss plaintiff's takings claim and defendant's motions for partial summary judgment regarding DOE's obligation to dispose of ComEd's GTCC waste and SNF.

## II. Motion To Dismiss Plaintiff's Takings Claim

### A. Standard of Review

RCFC 12(b)(6) governs dismissal of a claim based on "failure to state a claim upon which relief can be granted." RCFC

12(b)(6). In evaluating a motion to dismiss, "the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir. 1989). The court must also presume that well-pleaded factual allegations in the complaint are true. *Miree v. DeKalb County, Ga.*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir.1988). It is appropriate to grant a motion to dismiss under RCFC 12(b)(6) only if it appears "beyond doubt that [plaintiff] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 654, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (internal citations omitted); *Perez v. United States*, 156 F.3d 1366, 1370 (Fed.Cir.1998).

### B. Discussion

In Count IV, plaintiff seeks compensation for the taking of ComEd's real property. Compl. ¶ 51. Plaintiff maintains that defendant's breach of contract prevented ComEd from being able to decommission its nuclear plant sites "sooner than it otherwise would be able to" and from being able "to devote those sites to commercial uses." *Id.* ¶ 50. Plaintiff argues that it is deprived of the commercial use of the real property that it must use to store the SNF which the government has failed to remove. *Id.*

Defendant moves to dismiss plaintiff's takings claim pursuant to RCFC 12(b)(6) because defendant alleges that plaintiff fails to state a claim upon which relief may be granted.[7] Def.'s Takings MTD at 1. Defendant argues that DOE has not yet taken title to the SNF, that the NWPA provides that the utilities are responsible for interim storage of their SNF, and that absent the contract DOE would have no responsibility to accept or dispose of ComEd's SNF. *See* Def.'s Taking MTD at 13–14.

---

6. Facts cited to the pleadings of one party do not appear to be in dispute.

7. Pursuant to the court's findings in part III.B, any takings claim that plaintiff may have with regard to GTCC waste is not ripe and, therefore, the court declines to address defendant's motion to dismiss with regard to GTCC waste.

Plaintiff responds that it seeks to recover "for an injury to a real property interest separate from [its] interest under the Standard Contract." Pl.'s MTD Resp. at 5. Plaintiff argues that this court has "repeatedly recognized that a takings claim is appropriate despite the existence of a contract with the Government when the scope of the takings claim differs from the contract claim." *Id.* at 6.

■ The concept of a taking has limited application when the parties' rights have been voluntarily created by contract. *See Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 572 F.2d 786, 818 (1978); *Home Sav. of Am., F.S.B. v. United States,* 51 Fed.Cl. 487, 494 (2002) (*Home Savings*). Interference with contractual rights generally gives rise to a breach of contract claim, not a takings claim.[8] *Hughes Communications Galaxy, Inc. v. United States,* 271 F.3d 1060, 1070 (Fed.Cir. 2001) (quoting *Sun Oil,* 572 F.2d at 818); *Home Savings,* 51 Fed.Cl. at 494. While it is true that rights existing independently of a contract are not generally restricted to contractual remedies, *see Integrated Logistics Support Sys. Int'l, Inc. v. United States,* 42 Fed.Cl. 30, 34–35 (1998) (takings claim not dismissed because court could not conclude whether contract conferred the rights at issue), that is not the case here.

■ Plaintiff incorrectly argues that its "real property rights" are "separate and distinct" from its rights under the Standard Contract. Pl.'s MTD Resp. at 7. Although plaintiff may have real property interests that are separate from its interests under the Standard Contract,[9] plaintiff does not have a takings claim absent the rights and obligations granted to the parties by the Standard Contract. Plaintiff asserts that it has been deprived of the "full valuable economic use" of its sites and real property because it

must use that property for the storage of the SNF and HLW that has accumulated as a result of defendant's' breach. *See* Pl.'s Compl. ¶¶ 48–51.

But, as defendant correctly points out, prior to the Standard Contract DOE did not have an obligation to accept or dispose of plaintiff's SNF or HLW. *See* Defendant's Reply to Plaintiff's Response to Defendant's Motions to Dismiss Counts II, III and IV of Plaintiff's Complaint (Def.'s Takings Reply) at 5. Plaintiff alone was responsible for the storage and disposal of its SNF and HLW prior to the Standard Contract. *See* Def.'s Takings Reply at 2. Therefore, absent the contract, plaintiff would have been obligated to conduct the same or similar storage activities that it now asserts create a takings claim. The court finds that plaintiff's claim for a taking is dependent upon the existence of the Standard Contract and therefore plaintiff's rights are enforceable through a contract remedy. Defendant's motion to dismiss Count IV of plaintiff's complaint is GRANTED with respect to SNF and, for the reasons set out in part III.B below, DENIED as MOOT with respect to GTCC waste.

## III. Motions for Partial Summary Judgment

### A. Standard of Review

Summary judgment is proper when no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. Rule of the United States Court of Federal Claims (RCFC) 56(c). Genuine disputes of material fact that may significantly affect the outcome of the matter preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202

---

8. The recent decision in *Detroit Edison Co. v. United States* is distinguishable by its procedural posture. *See* 56 Fed.Cl. 299 (2003). The court in *Detroit Edison* has not yet ruled on the liability of the government under the breach of contract claim. In contrast, defendant in this case has been held liable for partial breach of contract. *See* Order, dated August 1, 2001. In *Detroit Edison,* the court emphasizes that "[i]f plaintiff succeeds on its breach claim, the court will award only the damages contemplated by the

Standard Contract and will not permit plaintiff to pursue a takings remedy in order to circumvent the limitations inherent in its contractual relationship with the Government." 56 Fed.Cl. at 303.

9. For example, plaintiff states that it "already owned that property" before entering into the Standard Contract. *See* Pl.'s Takings Resp. at 11.

(1986). A genuine dispute concerning a material fact exists when the evidence presented would permit a reasonable jury to find in favor of the non-movant. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

The non-movant must establish the existence of a material element on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-movant's evidence is examined in the light most favorable to the non-movant, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and all justifiable inferences must be drawn in favor of the non-movant. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Unsupported assertions or conclusory allegations are insufficient to withstand summary judgment. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed.Cir.1985).

## B. Greater Than Class C Radioactive Waste

Defendant moves for partial summary judgment on the issue of whether the government was obligated under the terms of the Standard Contract to accept and dispose of ComEd's GTCC waste. *See* Def.'s GTCC Mot. at 1. Defendant seeks to eliminate DOE's failure to remove GTCC waste as a basis for an award of damages in this case. *See id.* at 3.

Plaintiff and defendant agree that the Standard Contract requires DOE to accept and dispose of plaintiff's SNF and HLW. The parties disagree about whether GTCC waste constitutes HLW. In particular, the parties argue about the scope of the definition of HLW contained in Article I(12):

> The term 'high-level radioactive waste' (HLW) means—(a) the highly radioactive material resulting from the reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste that contains fission products in sufficient concentrations; and (b) other highly radioactive material that the [Nuclear Regulatory] Commission, consistent with existing law, determines by rule requires permanent isolation.

Pl.'s SNF App. at 294. The parties specifically disagree about the interpretation of Article I(12)(b). *See* Def.'s GTCC Mot. at 7–15, Pl.'s GTCC Resp. at 5–13, Def.'s GTCC Reply at 8–12. They dispute the interpretation of "other highly radioactive material" and whether the NRC has "by rule" required "permanent isolation" for GTCC. *Id.*

Defendant argues that the NRC has not determined by rule that GTCC is HLW and therefore DOE is not required by the terms of the contract to accept and dispose of plaintiff's GTCC waste. *See* Def.'s GTCC Mot. at 2–3. Defendant also contends that plaintiff's argument, that DOE would have accepted, even if not required to, GTCC concurrently with SNF and HLW, is not a basis for damages claim because such acceptance was not required by the Standard Contract. *See id.* at 3. Defendant maintains that under the NWPA, DOE currently lacks the authority to dispose of any material other than SNF or HLW in the repository contemplated by the NWPA. *See id.*

Plaintiff responds that defendant is obligated to remove GTCC waste under the Standard Contract because it satisfies the definition of "high-level radioactive waste" in Article I. *See* Pl.'s GTCC Resp. at 5–9. In the alternative, plaintiff argues that the question of GTCC waste is not ripe, and therefore not a justiciable issue, because ComEd has not yet identified any damages related to GTCC waste. *See id.* at 1 n. 2; *see also* Tr. at 45.

### 1. Justiciability Generally

"Although established under Article I, the [Court of Federal Claims] traditionally has applied the case or controversy requirement [of Article III] unless jurisdiction conferred by Congress demands otherwise." *Massachusetts Bay Transp. Auth. v. United States*, 21 Cl.Ct. 252, 257–58 (1990), *rev'd on other grounds*, 129 F.3d 1226 (Fed.Cir.1997). Article III of the Constitution "prohibits federal courts from issuing advisory opinions or deciding disputes that are not concrete and adverse." *Id.* (internal citations omitted).

■ A two-part test must be applied to determine whether a case is ripe for judicial

**658**

action. *See Abbott Labs. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Cedars–Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1580 (Fed.Cir.1993); *Lakewood Assocs. v. United States,* 45 Fed.Cl. 320, 331 (1999). The court must determine (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." *Abbott Labs.,* 387 U.S. at 149, 87 S.Ct. 1507.

#### 2. Fitness for Judicial Decision

Defendant argues that the issue of whether GTCC waste is covered by the Standard Contract is a legal issue that would not benefit from further factual development and is therefore ripe for judicial decision. *See* Def.'s GTCC Reply at 3. Defendant also argues that GTCC waste does not qualify as HLW because the NRC has not determined by rule that GTCC waste requires permanent isolation. *See* Def.'s GTCC Reply at 11. Defendant points to the NRC's approval of the request of Trojan Nuclear Plant (Trojan) to dispose of its GTCC waste by transforming it into Class C low-level radioactive waste through a "concentration averaging" process to support its argument that GTCC waste does not require permanent isolation. *See id.* at 12.

■ According to the Supreme Court, a claim is not ripe for judicial review if it is premised upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States,* 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998). The Supreme Court explained that "[the] basic rationale [for the ripeness doctrine] is to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect agencies from judicial interference until an administrative decision has been formalized . . . ." *Abbott Labs.,* 387 U.S. at 148–49, 87 S.Ct. 1507.

The question of whether DOE is obligated to accept and dispose of GTCC waste under the Standard Contract is not yet ripe because the issue is "contingent [upon] future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. Unit-*

ed States, 523 U.S. at 300, 118 S.Ct. 1257. Furthermore, plaintiff in this case has not made a claim for damages stemming from defendant's failure to accept and dispose of GTCC waste. *See* Tr. at 42; Pl.'s GTCC Resp. at 1 n. 2; *see also* Compl. *passim.* Plaintiff contends that, even if defendant had performed its obligations under the contract, plaintiff would not yet have asked defendant to pick up any of its GTCC waste. Tr. at 43. In addition, as plaintiff points out, the Nuclear Regulatory Commission's ruling regarding permanent isolation could change in the future thereby making any ruling here an improper advisory opinion. *See* Tr. at 43.

Provisions in the Standard Contract itself support the view that the GTCC issue is not yet ripe. The court notes that, in addition to the definition of HLW in Article I of the Standard Contract, Appendix E of the Standard Contract contains general specifications regarding the classification of the fuel. Pl.'s SNF App. at 344–346. Section D of Appendix E states:

> The DOE shall accept high-level radioactive waste. Detailed acceptance criteria and general specifications for such waste will be issued by the DOE no later than the date on which DOE submits its license application to the Nuclear Regulatory Commission for the first disposal facility.

Pl.'s SNF App. at 346. There is no evidence in the record that DOE has issued these "detailed acceptance criteria" for GTCC waste. Furthermore, defendant admits that the license application contemplated by Appendix E has not been submitted to the NRC and that it does not know when the license application will be submitted. Tr. at 13.

In addition, plaintiff points out that DOE's approval of Trojan's alternative method of disposal actually highlights the ripeness issue. Tr. at 51. Plaintiff argues that, if ComEd were also to be granted permission to transform its GTCC waste into low-level waste, then there will be no dispute regarding GTCC under the Standard Contract. *Id.* The court agrees and finds that the question of whether GTCC is included in defendant's contractual obligations is not yet ripe for judicial decision because the issue is contin-

gent upon future events that may not occur as anticipated. *See Texas v. United States,* 523 U.S. at 300, 118 S.Ct. 1257.

### 3. Hardship

■ Defendant argues that it would suffer "substantial hardship" if the court does not determine whether or not GTCC waste is included in the schedule for the order and rate of acceptance of nuclear waste, because the court will not be able accurately to determine the amount of damages attributable to defendant. Def.'s GTCC Reply at 4. Given that plaintiff is seeking damages only for defendant's partial breach of its obligations to accept and dispose of SNF, the court does not see the hardship to defendant if GTCC waste is not included in the acceptance rate. The burden of having to defend another lawsuit does not appear to be sufficient hardship to warrant immediate consideration of an issue not otherwise ripe for decision. *Cf. Molins PLC v. Quigg,* 837 F.2d 1064, 1067–68 (Fed.Cir.1988) (Federal Circuit confirms D.C. Circuit's holding that "the burden of having to file another suit … is hardly the type of hardship which warrants immediate consideration of an issue presented in abstract form.") [10].

### 4. Conclusion

■ It is premature for the court to decide whether DOE is obligated to accept GTCC waste as high-level radioactive waste when DOE has not yet completed its duty under the contract to detail the acceptance criteria for HLW. In addition, this dispute between the parties is not "concrete" because it is not known at this point whether plaintiff will request defendant to accept and dispose of GTCC waste as HLW pursuant to the Standard Contract or whether defendant will reject that possible future request. Finally, any hardship to the parties is not sufficient to justify the court's interference in the administrative decision-making process. Defendant's motion for partial summary judgment that GTCC waste is excluded under the Standard Contract is DENIED.

**10.** In appeals of patent law cases, the Federal Circuit applies the law of the circuit to which the district court appeals normally lie unless the

### C. Rate of Spent Nuclear Fuel Acceptance

Defendant also moves for partial summary judgment on the issue of the rate and order of acceptance of SNF and/or HLW for the purposes of assessing damages. *See* Def.'s SNF Mot. at 1.

### 1. Standard Contract Interpreted as a Contract

As a preliminary matter, defendant argues that the court should review and interpret the terms of the Standard Contract in accordance with the rules applicable to interpreting regulations. *See* Def.'s SNF Mot. at 7–10; Def.'s SNF Reply at 4–13. Defendant further argues that the United States Court of Appeals for the District of Columbia Circuit (D.C.Circuit) has previously ruled that the Standard Contract at issue in this particular case should be " 'viewed as a regulation' " and, therefore, plaintiff is barred by the principle of collateral estoppel from rearguing this issue. *See* Def.'s SNF Mot. at 8 (quoting *Commonwealth Edison Co. v. United States Dep't of Energy,* 877 F.2d 1042, 1045 (D.C.Cir.1989) (*Commonwealth Edison I*)).

#### a. Collateral Estoppel

Defendant maintains that plaintiff must overcome the hurdle of collateral estoppel in order to argue that the Standard Contract is to be interpreted as a contract and not a regulation. *See* Tr. at 59–60; Def.'s SNF Reply at 9. Defendant argues that the D.C. Circuit has already decided the same interpretation issue in a prior case between the same two parties and, therefore, plaintiff is estopped from rearguing the issue. *See id.*

Plaintiff responds that the D.C. Circuit did not decide the exact issue that is present here and, moreover, that there has been an intervening change in the law. *See* Tr. at 98–100. Plaintiff claims that the D.C. Circuit's holding is distinguishable because, while the court in that case held that the

issue pertains to or is unique to patent law. *See Molins PLC,* 837 F.2d at 1066 (internal citations omitted).

Standard Contract "is a regulation," the court did not find it was required to "treat it like a regulation." Tr. at 98. Plaintiff argues that recent decisions by both the D.C. Circuit and the Federal Circuit create an intervening change of law because both courts have interpreted the Standard Contract as a contract. *See* Tr. at 100; Pl.'s SNF Resp. at 10–14.

■ Under the doctrine of collateral estoppel, " 'a judgment on the merits in a first suit precludes relitigation in a second suit of issues actually litigated and determined in the first suit.' " *Shell Petroleum, Inc., v. United States,* 319 F.3d 1334, 1338 (Fed.Cir. 2003) (quoting *In re Freeman,* 30 F.3d 1459, 1465 (Fed.Cir.1994)). Collateral estoppel is appropriate if: (1) an issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) the resolution of the issue was essential to the final judgment in the first action; and (4) the party defending against issue preclusion had a full and fair opportunity to litigate the issue in the first action. *Id.* (internal citations omitted).

■ Collateral estoppel is "subject to exceptions when the circumstances dictate." *Bingaman v. Dep't of Treasury,* 127 F.3d 1431, 1437 (Fed.Cir.1997) (internal citations omitted). Collateral estoppel does not apply "when there has been a change in the applicable law between the time of the original decision and the subsequent litigation in which collateral estoppel is invoked." *Id.* "[S]ome marked advance or alteration in relevant orientation, approach, reasoning, or principles" qualifies as a change in the applicable law. *CBN Corp. v. United States,* 176 Ct.Cl. 861, 364 F.2d 393, 396 (1966) (internal citations omitted). In addition, collateral estoppel may not be appropriate if a redetermination of an issue may be necessary to "avoid inequitable administration of the laws." *Restatement (Second) of the Law of Judgments* § 28(2) (1982) (*Restatement of Judgments*); *see also Commissioner v. Sunnen,* 333 U.S. 591, 600, 68 S.Ct. 715, 92 L.Ed. 898 (1948).

■ In *Commonwealth Edison I,* the D.C. Circuit held that DOE's interpretation of the phrase "Treasury bill rate" from Article VIII of the Standard Contract was entitled to deference because DOE was construing a regulation of its own drafting and its interpretation was reasonable. *See* 877 F.2d at 1043. The D.C. Circuit reasoned that "the Standard Contract into which the parties entered should be viewed as a regulation." *Id.* at 1045. The D.C. Circuit explained that the language of the statute which specified that the Secretary must "enter into contracts" was "a matter of form rather than content." *Id.* (internal citations omitted).

In subsequent decisions, the Federal Circuit interpreted the disputes clause (Article XVI) of the Standard Contract and the avoidable delays clause (Article IX) and determined that plaintiffs were "not required to invoke the contract's disputes clause before bringing suit" for breach of contract when the government failed to begin disposal of SNF by January 1, 1998. *Maine Yankee,* 225 F.3d at 1343; *see also Northern States Power Co. v. United States,* 224 F.3d 1361, 1367 (Fed.Cir.2000). Although the Federal Circuit did not directly address the issue of whether to interpret the Standard Contract as a contract or regulation, the Federal Circuit's analysis appears to this court to be consistent with the view that the Standard Contract is to be interpreted as a contract rather than a regulation in a suit for damages for breach.

In addition, the court finds that an "inequitable administration of the laws" would result if collateral estoppel applied in this situation. *See Restatement of Judgments* § 28(2). This case is one of more than twenty that have been filed claiming damages from DOE for breach of contract under the Standard Contract.[11] The application of collateral estoppel could create inequitable administration of the Standard Contract merely because this particular plaintiff chose to litigate a previous, different issue under the Standard Contract. This distinction in interpretation could further develop "a fertile basis for litigious con-

---

11. *See* Case Nos. 98–126C, 98–154C, 98–474C, 98–483C, 98–484C, 98–485C, 98–486C, 98–488C, 98–614C, 99–447C, 00–440C, 00–697C, 00–703C, 01–115C, 01–116C, 01–249C, 01–551C, 02–898C, 02–926C, 02–1894C.

fusion." *See Commissioner v. Sunnen*, 333 U.S. at 599, 68 S.Ct. 715.

In light of the intervening Federal Circuit decisions, the court concludes that the bar of collateral estoppel should not be applied in this case because there has been a sufficient change in the "legal atmosphere" with respect to the issue of interpretation of the Standard Contract and, furthermore, because collateral estoppel would result in the inequitable administration of the laws. *See generally Bingaman*, 127 F.3d at 1438.

### b. Contract Not Regulation

Defendant also contends that, because the terms of the Standard Contract were promulgated through notice-and-comment rulemaking in the Federal Register, *see* Def.'s SNF Mot. at 7, the courts should interpret those terms using the principles of interpretation that are applicable to regulations. *See id.* at 8. Defendant concedes that each Standard Contract is a "contract" between the signatory parties, but argues that the provisions within the contract should be interpreted as regulations. *See* Def.'s SNF Reply at 4.

Plaintiff argues that the contractual relations of the United States " 'are governed generally by the law applicable to contracts between private individuals.' " Pl.'s SNF Resp. at 11 (quoting *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 607, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000)). Plaintiff points out that courts do not generally defer to agency interpretations of contracts that "would place no logical limit on the [agency's] ability to reduce its own contractual obligations." *Id.*

The Federal Circuit has held that "[t]he interpretation of regulations incorporated into a contract is purely a legal question." *Perry v. Martin Marietta Corp.*, 47 F.3d 1134, 1137 (Fed.Cir.1995) (internal citations omitted). The Circuit also explained that "an agency's interpretation of its own regulations is normally entitled to considerable deference." *Id.* (citing *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)). But an agency's interpretation of its own regulations is not given deference if it is not "reasonable and consistent." *Santa Fe Eng'rs, Inc. v. United States*, 801 F.2d

379, 381 (Fed.Cir.1986)(citing *Honeywell, Inc. v. United States*, 228 Ct.Cl. 591, 661 F.2d 182, 186 (1981)); *see also Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 627, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986) (observing that deference requires "the agency to explain the rationale and factual basis for its decision."). In addition, the agency's interpretation "must ... follow logically from the text of the statute." *Davis v. United States*, 50 Fed.Cl. 192, 204 (2001) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 485, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (stating that deference was not appropriate for an agency decision that "construe[d] the statute in a way that completely nullifies textually applicable provisions meant to limit [the agency's] discretion") (alterations in original); *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n. 9, 117 S.Ct. 1953, 138 L.Ed.2d 327 (1997) (holding that an agency decision is unreasonable when it relies on a logical fallacy)).

Furthermore, the Federal Circuit has held that deference is inappropriate in the context of a contract dispute in which the agency has a financial interest. *See S. Cal. Edison Co. v. United States*, 226 F.3d 1349, 1357 (Fed. Cir.2000) ("When a party enters into a contract with the government, that party should reasonably expect to be on equal legal footing with the government should a dispute over the contract arise."); *see also Brown v. United States*, 195 F.3d 1334, 1340 (Fed.Cir. 1999) ("The interpretation of regulations which are incorporated into government contracts is a question of law which this court is free to resolve."). Where there is a conflict between an agency's interpretation and the contract terms, the court notes that "[i]t is the unambiguous terms of the contract, not the unilateral beliefs of one of the parties, that define the parties' respective obligations." *Park Village Apartments v. United States*, 25 Cl.Ct. 729, 733 (1992) (citing *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934) (internal quotation omitted)).

It appears to the court, based on the analysis of each of defendant's alternative positions in parts III.C.2 through 6 below, that defendant's various positions neither "follow logically from the text," *Davis*, 50 Fed.Cl. at

204, nor are reasonably reflective of the intent of the parties. *See Santa Fe Eng'rs,* 801 F.2d at 381. Therefore, even if the doctrine of collateral estoppel were applicable to this case, and even if the provisions of the Standard Contract should be interpreted as regulations, the court finds that DOE's proposed interpretations of the Standard Contract are unreasonable and the court declines to defer to them.

### 2. Interpretation of the Standard Contract

#### a. Positions of the Parties

Plaintiff argues that the Standard Contract does not contain a SNF acceptance rate and therefore the court must look to the intent of the parties and the intent of the underlying statute, the NWPA, to supply a reasonable term. Pl.'s SNF Resp. at 17–22.

Defendant contends that "the schedule terms of the Standard Contract are not 'missing.'" Def.'s SNF Reply at 15. Defendant argues that the Standard Contract contains terms that detail the "manner in which specific acceptance schedules would be developed under the contract, through the submission and approval of delivery commitment schedules ('DCSs') and final delivery schedules ('FDSs')." *Id.*

#### b. Law Governing Interpretation of Standard Contract

Contract interpretation is a question of law. *Dalton v. Cessna Aircraft Co.,* 98 F.3d 1298, 1305 (Fed.Cir.1996); *Alaska Lumber & Pulp Co. v. Madigan,* 2 F.3d 389, 392 (Fed. Cir.1993). The purpose of contract interpretation is to carry out the intent of the parties. *See Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991). The intention of the parties to a contract controls its interpretation. *Beta Sys., Inc. v. United States,* 838 F.2d 1179, 1185 (Fed.Cir.1988).

Contract interpretation begins with the plain language of the written agreement. *Hercules Inc. v. United States,* 292 F.3d 1378, 1380–81 (Fed.Cir.2002) (internal citations omitted). Courts should read contract provisions to "'effectuate [the] spirit and purpose'" of the entire contract such that

"'an interpretation which gives a reasonable meaning to all of its parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous or achieves a weird and whimsical result.'" *Gould, Inc.,* 935 F.2d at 1274 (quoting *Arizona v. United States,* 216 Ct.Cl. 221, 575 F.2d 855, 863 (1978)). "[T]he task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court." *David Nassif Assocs. v. United States,* 214 Ct.Cl. 407, 557 F.2d 249, 258 (1977); *see also Restatement (Second) of the Law of Contracts (Restatement (Second) of Contracts )* § 204 (1981) (The court supplies "a term which is reasonable in the circumstances.").

#### c. SNF Acceptance Rate Term Missing from the Standard Contract

The court's analysis begins with the question of whether the Standard Contract on its face contains an acceptance rate. It does not. As plaintiff correctly points out, and defendant concedes, "'[T]he Standard Contract itself does not identify any minimum or particular rate at which DOE, once it starts acceptance, must continue that SNF and/or HLW acceptance.'" Pl.'s SNF Resp. at 17 (quoting Def.'s SNF Mot. at 2–3).

Nor does the DCS submission process in Article V of the Standard Contract contain language which indicates that the DCS process is intended to create a binding acceptance rate for the parties. *See* Pl.'s SNF App. at 300–03. And Article II, which describes the scope of the Standard Contract, merely states that "[t]he SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article V below." *Id.* at 296.

Article V(B) of the Standard Contract provides that "[a]fter DOE has issued its proposed acceptance priority ranking," plaintiff "shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW [plaintiff] wishes to deliver to DOE beginning sixty-three (63) months thereafter." Pl.'s SNF App. at 301. DOE "shall approve or disapprove such schedules within three (3) months after receipt." *Id.*

The Standard Contract then provides the process by which the parties can negotiate if DOE disapproves of a submitted DCS. Once the DCS is approved, plaintiff "shall have the right to adjust the quantities of SNF and/or HLW plus or minus [ ] twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule." *Id.*

Paragraph (C) of Article V further provides that plaintiff "shall submit to DOE final delivery schedules [ (FDS) ] not less than twelve (12) months prior to the delivery date specified therein." *Id.* at 302. The Standard Contract instructs that the FDS covers the "delivery of SNF and/or HLW covered by an approved [DCS(s)]." *Id.* at 301–302. No final delivery schedules have been submitted in this case.

In addition to the DCS submission process, Article IV(B)(5)(b) of the Standard Contract established that "DOE shall issue an annual capacity report for planning purposes" by July 1, 1987. Pl.'s SNF App. at 300. Article VI(B)(1), describing the specific acceptance procedures and general criteria for disposal, states that "[DCSs] for SNF and/or HLW may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate." Pl.'s SNF App. at 304.

The ACR issuance and the DCS submission is a two-step process which the Standard Contract develops for the exchange of information between the parties. As Article V specifically states, the DCSs merely "identify all SNF and/or HLW the Purchaser *wishes to deliver* to DOE ...." Pl.'s SNF App. at 301 (emphasis added). This mechanism does not create a contractually binding obligation for either party. The ACRs are, according to the Standard Contract terms, for "planning purposes" only. Pl.'s SNF App. at 300. The court finds that there is no evidence that the exchange of DCSs was intended to create a contract between the parties.

The non-binding and preliminary planning character of the DCS process is further supported by the time frames involved. The exchange of documents begins sixty-three months prior to the date of anticipated SNF delivery and continues up until the submis-

sion of the FDS twelve (12) months prior to the specified delivery date. *See* Pl.'s SNF App. at 301–302.

Because the Standard Contract, including specifically the ACR and DCS process, does not contain or create a SNF acceptance rate, the court considers the parties' other arguments.

### 3. Overview of the Parties' SNF Acceptance Rate Arguments

Defendant addresses the absence of an acceptance rate by several arguments which, if found persuasive, would limit its damages significantly. Defendant argues that DOE was not contractually obligated to accept any additional SNF and/or HLW other than the amounts set forth in the approved DCSs and that, moreover, the Standard Contract did not obligate defendant to continue acceptance, once begun, at any minimum rate. *See* Def.'s SNF Mot. at 4, 23–38. Second, defendant asks the court to find that the DCSs, submitted by plaintiff to DOE pursuant to Article IV(B) of the Standard Contract, constitute binding commitments that establish the rate and order of SNF and/or HLW acceptance for the purposes of assessing damages in this case. *See id.* at 3–4, 10–21. Third, defendant asks the court to use the schedule published by DOE in the 1995 Annual Capacity Report and Acceptance Priority Ranking (1995 ACR/APR) for the purposes of determining damages because the 1995 ACR/APR reasonably limited the acceptance schedule to a 10,000 Metric Tons Uranium (MTU) amount established by the 1987 amendments to the NWPA. *See id.* at 5–6, 38–45 (citing 42 U.S.C. § 10168(d)(3)). Finally, defendant contends that if the court finds that no acceptance rate is specified in accord with its various arguments, then the court "should remand this matter to the agency to issue a final decision identifying an appropriate schedule." *Id.* at 46–47.

### 4. More than an Obligation to "Begin" SNF Acceptance

 Defendant argues that because "DOE intentionally excluded from the Standard Contract any obligation, after it had

beg[u]n SNF and/or HLW acceptance, to continue that acceptance at any minimum rate," *id.* at 32, that DOE was obligated only to "begin" SNF and/or HLW acceptance. *Id.* at 35. Defendant concludes that the court cannot assess damages beyond the SNF acceptance rates established in the approved DCSs which, defendant argues, were the only binding commitments it made. *Id.* at 23, 35.

Plaintiff responds that defendant "grossly misstates" recent law, *see* Pl.'s SNF Resp. at 38–41, and that defendant's argument that it had only a minimal obligation to accept SNF would render the Standard Contract unenforceable as an illusory contract. *See id.* at 45–46.

Article II of the Standard Contract states that "[t]he services to be provided by DOE under this contract shall *begin*, after commencement of facility operations, not later than January 31, 1998 and shall *continue* until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A ... has been disposed of." Pl.'s SNF App. at 296 (emphasis added). The NWPA states:

> Contracts entered into under this section shall provide that–
>
>> (A) following commencement of operation of a repository, the Secretary shall take title to the [HLW] or [SNF] involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
>>
>> (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the [HLW] or [SNF] involved as provided in this subchapter."

42 U.S.C. § 10222(a)(5).

The D.C. Circuit interpreted the obligations of DOE under subsection (A) ("take title to") and subsection (B) ("will dispose of") of the NWPA as independent and held that the absence of a repository did not affect DOE's obligations under subsection (B). *See Indiana Michigan Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1276–1277 (D.C.Cir. 1996) (*Indiana Power*); *see also Northern*

*States Power Co. v. United States*, 128 F.3d 754, 757 (D.C.Cir.1997). The D.C. Circuit concluded that "section 302(a)(5)(B) [of the NWPA] creates an obligation in DOE, reciprocal to the utilities' obligation to pay, to start disposing of the SNF no later than January 31, 1998." *Indiana Power*, 88 F.3d at 1277.

Defendant's argument that it is not obligated to continue the acceptance of SNF at any minimum rate is in direct conflict with the plain language of the Standard Contract. Article II of the Standard Contract by its terms requires defendant to "continue" accepting SNF "until such time as all SNF and/or HLW ... had been disposed of." Pl.'s SNF App. at 296. Defendant's obligation to "dispose of" SNF beginning no later than January 31, 1998, *see* 42 U.S.C. § 10222(a)(5)(B), exists and can be enforced entirely independently of its obligation to "take title to" SNF "as expeditiously as possible," 42 U.S.C. § 10222(a)(5)(A).

Defendant's further argument that DOE was not obligated to have an operational permanent repository available on January 31, 1998, *see* Def.'s SNF Mot. at 31, would have no bearing on defendant's contractual obligations to dispose of SNF. As stated by the D.C. Circuit, "that Congress contemplated that [a permanent repository] would be available [by January 31, 1998] does not mean that Congress conditioned DOE's obligation to begin acceptance of SNF on the availability of a facility." *Indiana Power*, 88 F.3d at 1277; *see also Northern States Power*, 128 F.3d at 760 ("[T]he NWPA directs DOE to undertake the duty to begin taking the SNF by January 31, 1998, whether or not it has a repository or interim storage facility.").

In addition, as plaintiff correctly points out, defendant's minimalist interpretation of its obligations under the Standard Contract threatens to create an unenforceable illusory contract. "An illusory contract is an agreement in which one party gives consideration that is so insignificant that an actual obligation cannot be imposed." *Woll v. United States*, 45 Fed.Cl. 475, 478 (1999) (citing *Torncello v. United States*, 231 Ct.Cl. 20, 42,

681 F.2d 756 (1982) (internal citation omitted)).

Plaintiff in this case has paid, and defendant has accepted, over one billion dollars in quarterly fees under the Standard Contract. *See* Plaintiff's Proposed Findings of Uncontroverted Fact Regarding the Rate of Spent Nuclear Fuel Acceptance (Pl.'s SNF PFUF) ¶ 53. There is a striking asymmetry when plaintiff pays in full for performance by defendant virtually at defendant's option. Defendant's interpretation that it is obligated only to "begin" and not to "continue" acceptance of SNF and/or HLW, would render much of the contract illusory because it would "leave [DOE's] future action subject to [its] own future will" thereby leaving the parties with a promise that had little meaning. *Ridge Runner Forestry v. Sec'y of Agric.*, 287 F.3d 1058, 1061 (Fed.Cir.2002) (internal citations omitted).

### 5. DCS Submissions and Annual Capacity Reports Not Binding

 Alternatively, defendant relies on the several DCSs that plaintiff submitted under Article V of the Standard Contract and the fact that DOE approved several of those DCSs, *see* Def.'s SNF Reply at 30, as creating a contractual agreement for an acceptance schedule for the years to which the approved DCSs applied. *Id.*

Plaintiff contends that the approved DCSs were not contractually binding, *see* Pl.'s SNF Resp. at 69, and that defendant's attempt to limit its damages through the DCS process could constitute a breach of its implied covenant of good faith and fair dealing. *See id.* at 70.

In 1992, in anticipation of the utilities' first opportunity to submit DCSs, DOE requested that the utilities submit DCSs based on the allocations in the 1991 ACR. *See* Pl.'s SNF App. at 1601. In the cover letter enclosing the "Instructions for Completing the Appendix C Delivery Commitment Schedule [ (DCS Instructions) ]," DOE explained that "[t]he allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals." *Id.* The "Specific Instructions for Completion of DCS [ (DCS Specific Instructions) ]" informed the utilities that "the

total quantity of SNF designated for delivery must not exceed the allocation in the ACR; exceeding the allocation will result in disapproval of the DCS(s)." *Id.* at 1608. Defendant does not explain how, in the light of this instruction, it intended in good faith to carry out the negotiating and revising aspects of the DCS process. *See* Pl.'s SNF App. at 301 (Article V(B)).

The court agrees that DOE's use of the 1991 ACR to limit the amount of SNF requested by the utilities in their DCS submissions may be a breach of defendant's duty of good faith and fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Restatement of (Second) Contracts* § 205 (1981). The duty of good faith "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . . ." *Id.* § 205 cmt. a. Defendant's use of the 1991 ACR to limit the utilities' DCS submissions does not appear to the court to be consistent with the "justified expectations" of plaintiff, including its expectations with regard to negotiating and revising its DCSs in accordance with Article V(B) of the Standard Contract.

Plaintiff began submitting DCSs in August 1992 as required by Article V(B)(1) of the Standard Contract. *See* Pl.'s SNF Resp. at 57. Plaintiff followed DOE's instructions and filed DCSs containing the amount allocated plaintiff in the ACR. *Id.* Defendant approved plaintiff's DCS submissions for the delivery years 1998, 1999, and 2000, but disapproved the DCS submission for 2002 and did not respond to plaintiff's 2001 and 2003 submissions. *Id.* at 57–58. In 1997, DOE notified the utilities that it was waiving until further notice the utilities' obligation to submit revised DCSs because DOE was unable either to approve or disapprove the submissions. Def.'s SNF Reply at 31; Pl.'s SNF App. at 422. Plaintiff then stopped submitting DCSs. Pl.'s SNF Resp. at 59. There is no evidence before the court that plaintiff ever submitted or DOE ever approved a FDS for any year.

The 1991 ACR itself states that "[a]s specified in the Standard Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or [plaintiff.]" Pl.'s SNF App. at 1553–54. Defendant eventually conceded at oral argument that the ACRs were for planning purposes. *See* Tr. at 61. DOE's position that it would reject plaintiff's DCS submission if it "exceed[ed] the allocation in the [1991] ACR," Pl.'s SNF App. at 1608, is inconsistent with plaintiff's justified expectation that the ACRs were negotiable and to be used for "planning purposes." *Id.* at 1553–54. The parties could not have expected that planning documents would create binding contractual obligations.

In these circumstances, plaintiff's submission and defendant's acceptance of the proposed DCSs did not create a contractually binding obligation for either party. Even if the process defined in Article V of the Standard Contract could, if followed and completed in good faith, create a contractual obligation, the third step in the process was not completed because plaintiff did not submit and defendant did not approve a FDS for any year.

### 6. Acceptance Rate Based on 1987 Amendments to NWPA Not Controlling

#### a. 10,000 MTU Acceptance Rate

■ Defendant also argues that the ACRs issued between 1991 and 1995 contain reasonable rates of SNF acceptance because "they implement the limitations imposed by the 1987 amendments to the NWPA ...." Def.'s SNF Mot. at 43.

The 1987 Amendments to the NWPA (1987 Amendments) established a 10,000 MTU limit on DOE's ability to accept SNF prior to opening of an operational permanent repository. *See id.* at 43 (citing 42 U.S.C. § 10168(d)(3)). DOE calculated yearly SNF allocations in the 1991 ACR and subsequent ACRs by dividing 10,000 by 12 years (to account for the number of years before a

permanent repository was then expected to be operational) and arrived at a baseline acceptance rate of 900 MTU per year (900 MTU rate).[12] *See id.* at 44; Tr. at 63.

The 10,000 MTU acceptance rate, upon which the 900 MTU rate was based, applied if DOE built a "monitored retrievable storage facilit[y]" (MRS), a disposal "option" created by the 1987 Amendments to supplement any permanent repositories to be built. *See* 42 U.S.C. §§ 10161, 10168(d)(3). The licensing conditions to obtain authorization for the construction of a MRS required that "construction [of a MRS] may not begin until the [NRC] has issued a license for the construction of a [permanent] repository." 42 U.S.C. § 10168(d)(1). Defendant concedes that "DOE has never constructed a MRS [ ] authorized pursuant to 42 U.S.C. § 10162(b), subject to the licensing and construction requirements of 42 U.S.C. § 10168, and funded under the authority provided in section 10222(d) of the NWPA." Defendant's Responses to [Pl.'s SNF PFUF] at 389. There has not yet been a license issued for the construction of a permanent repository. *See* Tr. at 13.

The court does not agree with defendant that it is entitled to limit its damages based upon an optional disposal method of which it did not avail itself. The 10,000 MTU limitation applied only to a MRS until a permanent repository began accepting SNF; the 1987 Amendments did not apply this limitation to DOE's obligation to dispose of SNF under the Standard Contract beginning January 31, 1998.

#### b. Intent of the Parties

■ Plaintiff also presents evidence that the 900 MTU rate does not conform with either the intent of Congress or the intent of the contracting parties. *See* Pl.'s SNF Resp. at 28. Plaintiff argues that the evidence demonstrates that the NWPA and the Standard Contract contemplated an acceptance rate that would avoid construction by the utilities of additional at-reactor storage after 1998 and that would reduce the existing SNF

---

12. Of course, 10,000 divided by 12 yields 833. The actual proposed allocations were adjusted downward to 400 MTU and 600 MTU for the first two years so that the MTUs proposed to be accepted for 12 years totaled 10,000. *See* Def.'s SNF Mot. at 44–45.

backlog within a reasonable time. *See id.* Plaintiff maintains that the evidence shows that an acceptance rate of 3,000 MTU per year (3,000 MTU rate) is necessary to achieve those objectives. *Id.*

Defendant argues that the objectives proposed by plaintiff are not supported by the language of the NWPA. Def.'s SNF Reply at 36. Defendant also asserts that, even if plaintiff is correct regarding the intent of the parties and Congress, the 900 MTU rate satisfies those objectives. *See* Def.'s SNF Reply at 52–57.

The deposition testimony of several DOE officials involved with the SNF program supports plaintiff's assertion that the intent of the NWPA and the parties was to avoid the construction by utilities of additional at-reactor storage. *See* Pl.'s SNF Resp. at 29. DOE's own document, the draft Civilian Radioactive Waste Management Program Mission Plan (Mission Plan), stated, "The waste materials will be accepted in accordance with a Waste Acceptance Schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998." Pl.'s SNF App. at 936, 941. Another internal DOE document states that "the minimum acceptance rate should be . . . consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31, 1998." Pl.'s SNF App. at 1070. Plaintiff also points to sections of the legislative history of the NWPA which support this evidence. *See* Pl.'s SNF Resp. at 31.

Additional evidence supports plaintiff's argument that the 900 MTU rate was not considered the acceptance rate necessary to achieve the objectives of the NWPA. DOE officials testified that the 3,000 MTU rate was determined to be the acceptance rate necessary to both prevent additional at-reactor storage and reduce the backlog of SNF.[13] *See* Pl.'s SNF Resp. at 34–35. In addition,

plaintiff presents both DOE documents and deposition testimony that support its contention that the quarterly fees plaintiff paid under the Standard Contract were based on the assumption that DOE would remove waste at the 3,000 MTU rate. *See id.* at 36–37.

In view of the procedural posture of this case [14] and the fact-specific inquiry necessary to determine the intent of Congress and the parties, the court does not reach a conclusion about the possible applicability of either the 900 MTU rate or 3,000 MTU rate at this juncture. The court will, as it is required to do, *see David Nassif Assocs.,* 557 F.2d at 258, determine the missing acceptance rate term in further proceedings for that purpose. Defendant's motion for partial summary judgment on the rate of spent nuclear fuel acceptance is DENIED.

### 7. No Remand for Agency Determination

Finally, defendant maintains that, if the court finds that the Standard Contract does not contain a SNF acceptance rate, then the court should remand the issue to DOE for agency determination of an appropriate schedule. *See* Def.'s SNF Mot. at 47. Defendant points out that Rule [56.2] allows the court to " 'remand appropriate matters' " to the agency " 'with such direction as may be deemed proper and just.' " [15] *Id.* at 47 (quoting RCFC [56.2] ). Alternatively, defendant argues that the schedule issue should be referred to the agency pursuant to the doctrine of primary jurisdiction because the matter requires specialized expertise. *See id.* at 47 n. 13.

Plaintiff argues that Rule [56.2] is not appropriate here because it is limited to situations involving traditional agency regulatory decisions where the court has determined that an agency's actions were not supportable. *See* Pl.'s SNF Resp. at 71. Plaintiff contends that this case does not involve an

---

13. Interestingly, DOE's 1987 ACR identified a 2,650 MTU acceptance rate after a six-year ramp up period, *see* Pl.'s SNF App. at 1350, and DOE's 1988 ACR identified a 3,000 MTU acceptance rate after a five-year ramp up period. *See id.* at 1376.

14. Plaintiff has not filed a cross-motion for summary judgment.

15. Formerly (and *cited by defendant as*) RCFC 60.1. *See* Rules of the United States Court of Federal Claims, revised May 1, 2002.

appeal of an agency regulatory determination but instead involves the adjudication of the government's breach of contract which plaintiff argues is "within [the court's] 'conventional competence.' ". *See id.* at 72–73 (internal citations omitted). Plaintiff also argues that the doctrine of primary jurisdiction is not applicable and that reliance on it would deny plaintiff's due process right to an impartial adjudication. *See id.* at 74 n. 33. The court agrees.

The issue currently before the court is what damages, if any, defendant owes plaintiff as a result of defendant's breach of contract. The determination of damages in a breach of contract case is squarely within this court's jurisdiction. *See* 28 U.S.C. § 1491(a); *see also Pacetti v. United States,* 50 Fed.Cl. 239, 243–44 (2001). In addition, it is not appropriate to remand the question of rate acceptance to DOE, thereby allowing an agency with a "substantial pecuniary interest" in the outcome to adjudicate the question of damages. *Gibson v. Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973).

For similar reasons, the doctrine of primary jurisdiction does not apply to this case. The Supreme Court has explained that the doctrine of primary jurisdiction requires the referral to an agency of issues which have been "placed within the special competence" of a particular agency under a "regulatory scheme." *See United States v. W. Pac. R.R. Co.,* 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). The question of money damages resulting from a breach of contract falls squarely within this court's jurisdiction. In addition, Congress specifically directed that the relationship between DOE and the utilities be defined by a contract. *See* 42 U.S.C. § 10222.

IV. Conclusion

For the foregoing reasons, defendant's Motions to Dismiss Counts II and III are GRANTED, defendant's Motion to Dismiss Count IV is GRANTED except with respect to GTCC waste, as to which the motion is DENIED as MOOT, defendant's Motion for Partial Summary Judgment Regarding Plaintiff's Greater than Class C Radioactive Waste Arguments is DENIED, and defendant's Motion for Partial Summary Judgment Regarding the Rate of SNF Acceptance is DE-NIED, and defendant's request that this court remand the question of the SNF acceptance rate to DOE is DENIED. On or before June 25, 2003, the parties shall submit a joint proposal or, if they cannot agree, separate proposals, for further proceedings in this matter, including a pretrial schedule as contemplated by Appendix A to the Rules of the Court of Federal Claims, to address the determination of damages on the basis of an acceptance rate to be determined at trial.

IT IS SO ORDERED.

